CHARLES RUTLEDGE, d/b/a Charles Rutledge General Contractor, Plaintiff-Appellant, *v.* HOUSING AUTHORITY OF THE CITY OF EAST ST. LOUIS, Defendant-Appellee.

Fifth District    No. 79-317

Opinion filed September 18, 1980.

Kassly, Bone, Becker & Dix, P. C., of Belleville (Barry D. Dix, of counsel), for appellant.

Edward Neville, of East St. Louis, for appellee.

Mr. JUSTICE HARRISON delivered the opinion of the court:

Plaintiff below, Charles Rutledge, a construction contractor, appeals from a judgment denying his claim for the reasonable value of services rendered to defendants, the Housing Authority of the city of East St. Louis, Illinois, which was based upon the theory of a contract implied in law. Judgment was rendered in the circuit court of St. Clair County on December 2, 1975, following a directed verdict in favor of the defendant. Plaintiff's initial post-trial motion was filed December 30, 1975, and an order denying the motion was entered on March 23, 1979. Rutledge charges the circuit court with a single encompassing error, that, contrary to its findings, the plaintiff did carry his burden of proof in attempting to establish a right to recover based on the doctrine of quantum meruit. We affirm the decision of the circuit court.

The defendant (hereinafter referred to as the Housing Authority), organized in conformity with the Housing Authorities Act (Ill. Rev. Stat. 1979, ch. 67½, par. 1 et seq.), sought to construct a new central office building in order to house its administrative staff and invited planning and construction proposals based on what is referred to as the "Turnkey" development procedure. The latter is a project methodology whereby a developer designs and constructs the facility concerned at a given site and upon completion the finished product is sold to the Housing Authority. During the interim period of planning and construction, done in conjunction with and according to the needs and specifications of the Housing Authority, the developer is engaged in an independent venture and carries the cost of financing the operation. The official bidding invitation was issued December 3, 1971. It indicated that the entire project would require the coordinate approval of both the Housing Authority and that of the

Housing Assistance Office of the United States Department of Housing and Urban Development (hereinafter referred to as HUD), since Federal funds were essential to its accomplishment. Page 5 of the invitation consisted of the following paragraph:

> "This Housing Authority, after conferring with the U.S. Department of Housing and Urban Development, Housing Assistance Office, will evaluate the Developer's proposals as to (1) Reasonableness of the prices, and (2) Designs and typical site layout; in accordance with the procedures of Paragraph 4 of the Low-Rent Housing Turnkey Handbook, RHA 7420.1, (3) Experience of Developers, (4) Affirmative Action Program, and (5) Financial capability of Developer. In selection of the most satisfactory development proposal the Housing Authority of the City of East St. Louis will not be bound to make that selection on the basis of the lowest price. This Authority reserves the right to reject, accept, or request modification of any and all proposals submitted in response to this invitation."

The Turnkey Handbook, issued to all bidders, detailed a 12-step process on pages 1 and 2 leading up to the commencement of construction.

> "c. The sequence of steps for Turnkey projects is set forth below. Except as stated in paragraph 1d below, all of the steps and related procedures set forth in this Handbook shall be taken for each Turnkey project in the order stated. Briefly, these include, following the approval of the LHA's application for a low-rent housing program, the following steps:
>
> > (1) the advertisement by the LHA for Turnkey proposals;
> >
> > (2) the evaluation of proposals by the LHA and the Regional Housing Assistance Office (HAO);
> >
> > (3) the appraisal of the proposed site;
> >
> > (4) the Feasibility Conference during which agreement is reached on the project design and the price of the land;
> >
> > (5) the developer's preparation of preliminary drawings and outline specifications;
> >
> > (6) independent cost estimates and LHA and HAO evaluation of the proposed price for improvements;
> >
> > (7) the Negotiation Conference during which a price for the improvements is agreed upon;
> >
> > (8) the preparation of the LHA Development Program;
> >
> > (9) the execution of the Annual Contributions Contract between the LHA and HUD and the Letter of Intent by the LHA, the developer, and HUD;
> >
> > (10) the developer's preparation of working drawings and specifications and their review and approval by the LHA and the HAO;

(11) the submittal of such working drawings and specifications for updated cost estimates;

(12) the execution and approval of the Contract of Sale between the developer and the LHA; * * *."

On page 2 under subpart d of the general introduction decribing the Turnkey procedure to the prospective bidder, an accelerated process of planning negotiation is outlined:

"d. As an alternative, the developer may request an Accelerated Turnkey Program (ATP) following his selection as the Turnkey developer. ATP permits a developer to submit his working drawings and specifications at the time of or immediately after his selection rather than waiting until the approval of the Letter of Intent. A Feasibility Conference is not held. Instead, the developer's working drawings and specifications are submitted to two cost estimators at the same time as the proposed site is being appraised. The developer then attends a Negotiation Conference at which a price for land and a price for improvements are separately agreed upon. Thereafter, following approval of the Development Program and the execution of the Annual Contributions Contract, the developer may enter directly into the Contract of Sale with the LHA. Thus, under ATP the following Turnkey steps are not required: the Feasibility Conference and, in connection therewith, the preparation and review of rough sketches and general description of the project; the preparation and review of the preliminary drawings, outline specifications, etc.; the entire cost estimating and evaluation process in connection with the preliminary drawings; and the Letter of Intent."

Evidence adduced at trial indicated that of nine proposals submitted before the closing date of January 18, 1972, the appellant's was considered the most acceptable in terms of overall quality and price; the choice was not on a competitive cost basis but rather each project was evaluated individually according to a merit-for-cost standard. Formal notification of his tentative selection as developer was sent to the plaintiff by letter of May 22, 1972. However, prior to this official notice Donnell Curry, executive director of the Housing Authority, received notification of HUD's approval of the selection of Rutledge as proposed developer by letter of March 24, 1972. It appears that a copy of the March 24 letter was shown to the plaintiff almost immediately and that even prior to that date plaintiff's architect, Glenn Mantle, was made aware of the various proposals found to be unacceptable as they were vetoed, so that knowledge of the approval of appellant's preliminary plan predated the official notice by some two months.

As soon as the tentative selection became apparent the parties proceeded in earnest with more detailed development planning which

included Mantle's work on refined drawings. However, the evidence does not establish that an Accelerated Turnkey Program was intended as the regime under which Rutledge would go forward or that the parties in fact operated on such a basis. To the contrary, by all the evidence it seems that they adhered to standard procedures. The Housing Authority requested and Rutledge attended a feasibility conference on May 30, 1972, held in Chicago at HUD's Regional Housing Assistance Offices. At the meeting HUD and the Housing Authority requested alterations and additions to the plans submitted in accordance with the May 22 letter. Many revisions ensued together with further cost analyses. A construction conference was finally held on August 23, 1972, as well as a subsequent contract of sale conference. On February 19, 1973, defendant caused sale contract documents to be forwarded to the plaintiff and on March 26, 1973, Rutledge responded with a request for a price increase of $69,551.19, in addition to the tentative proposal price of $554,850. During the period of planning and negotiation inflation had produced increased and unanticipated costs in both financing and construction. Government officials desired more specific details explaining the increases and in supplying more extensive information the developer requested that the total increase figure be raised to $83,377.19. This proposal was made on April 27, 1973. The contract documents originally forwarded were never signed, and no revised contractual agreement was ever reached. Plaintiff informed the Housing Authority that he was withdrawing his initial proposal to build the facility in June of 1973, and on June 12, 1974, filed the present complaint. It was contended that 1,061 hours were consumed in preparation of the central office building project and that together with other expenses incurred the plaintiff was entitled to $150,000 as representing the reasonable value of his services. After receiving all of the plaintiff's evidence Judge Kenneth Juen directed a verdict in favor of the Housing Authority, and this appeal followed.

■■ In seeking to overturn the judgment of the trial court which rendered the directed verdict below, appellant is confined to the standard imposed by the rule in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504. That rule dictates that we leave standing such a verdict where all of the evidence, when viewed in its aspects most favorable to the opponent, here the developer, so overwhelmingly favors the movant that no contrary verdict could ever stand.

■■■ Appellant has proceeded on the basis of establishing grounds which would compel the law to imply an obligation on the part of the appellee to pay Rutledge for his efforts in attempting to reach an agreement to construct the proposed facility. A most thorough statement of the basis and historical origin of the doctrine variously referred to as quasi-contract,

contract implied in law, or quantum meruit is provided in *Board of Highway Commissioners v. City of Bloomington* (1911), 253 Ill. 164, 173, 97 N.E. 280. The opinion states that the obligation enforced is independent of any agreement between the parties or of their personal intentions and that the use of the term contract is a mere fiction owing to procedural history. The action is said to be maintainable wherever one party has received money or its equivalent under circumstances in which, according to the dictates of equity and good conscience, he ought not to retain such benefit. The principle is applicable to services as well, for which, under the proper facts, the defendant is charged with a duty to pay. (*Nardi & Co. v. Allabastro* (1974), 20 Ill. App. 3d 323, 327, 314 N.E.2d 367.) The period to be scrutinized in determining the equity of the remedy is that period when the benefit was conferred, for an implied contract is said to "arise" then if at all, according to the status of the parties and not as a result of subsequent change of circumstance. (See *Bloomgarden v. Coyer* (D.C. Cir. 1973), 479 F.2d 201, 212.) Appellant stresses that an entitlement to the reasonable value of services is, as a matter of law, independent of the intentions of the parties and irrespective of whether any express or implied in fact contract existed between them. Nevertheless, it is important to consider the context in which particular services are rendered in determining whether any benefit accruing to the defendant would be unjustifiably retained absent the intercession of equitable principles. It is *unjust* enrichment which is to be avoided. (*Chandler v. Washington Toll Bridge Authority* (1943), 17 Wash. 2d 591, 137 P.2d 97, 102; Restatement of Restitution §1, comment *c* (1937).) The restatement articulates this fundamental aspect of the doctrine:

> "c. *Unjust retention of benefit*. Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor."

■■ It follows from the requirement of an inequity that there is no general responsibility to compensate one for work and labor done irrespective of the circumstances in which it is carried out. (*Dunn v. Phoenix Village, Inc.* (W. D. Ark. 1963), 213 F. Supp. 936, 952.) Where preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations related thereto, quasi contractual relief is unwarranted. (See *Bloomgarden v. Coyer* (D. C. Cir. 1973), 479 F.2d 201, 210-12; *Maple Island Farm, Inc. v. Bitterling* (8th Cir. 1954), 209 F.2d 867, 872, *cert. denied* (1954), 348 U.S.

882, 99 L. Ed. 694, 75 S. Ct. 123.) While the cases cited may be factually distinguishable in literal terms, the principles recited are sound when applied to the circumstances with which we are presented.

■■ Here, the parties were involved in the negotiation of a public contract. The procedures imposed on the process of negotiation, related in detail to the present bidder, created known contingencies precedent to the letting of a contract. The prospect of a sizeable office construction project secured by the financial resources of the United States Government carried with it the conditions which Federal policies demanded. These contingencies and progressive negotiations amounted from the beginning to a part of the defendant's bargaining position. The working relationship of the parties was clearly understood from the bidding onward, the very first paragraph of the Turnkey Handbook stating:

> "If the developer's proposal is acceptable to the LHA and the Department of Housing and Urban Development (HUD), the LHA will enter into a Contract of Sale under which the LHA agrees to purchase the completed development."

It cannot come as a surprise to the appellant that no other consideration was contemplated than the purchase price of the completed building. Testimony well established that the participating parties had a thoroughgoing knowledge of this form of real estate development. Appellant's architect, involved in the project from its earliest stages, had a working familiarity with the Turnkey process, which originated in the late 1960's. He had done extensive work for the Housing Authority stretching back to 1964. It was known that architectural services were extended on an "if come" basis, meaning that if the project were consummated then payment would follow, but not in the event that the proposal was scrapped. It appears that Mantle issued invoices for significant amounts regarding accomplished work on the plans through the last half of 1971 and into January of 1972 with the understanding that both he and Rutledge were gambling on the successful completion of the structure. In an initial round of bidding for the same office building, one in which Rutledge and Mantle participated, every proposal submitted was rejected, and a new invitation issued. Of significant import is the fact that project plans are submitted as an entire proposal and work on subsequent phases is essentially a refinement process As much as 90% of the work which went into the final drawings had been accomplished by the time of HUD's March 24, 1972, letter notifying the Housing Authority of its concurrence in the tentative selection of Rutledge. Another element of uncertainty was lent to these transactions in that no final price was ever agreed but rather continued, at least in the mind of appellant, a matter open to negotiation. Inflation, coupled with changes in the planned structure, bit larger and larger chunks out of the original figure quoted. By the time a stalemate was reached, appellant was

requesting over $83,000 more than initially proposed. We are of the opinion that all of the negotiations were bent upon reaching a final agreement. Appellant maintains, however, that the Housing Authority benefited through the preparation of the plans submitted and renegotiated. Nonetheless, even if we assume for the sake of argument that the defendant was enriched, an issue which we see no need to expressly determine, then that enrichment was extended voluntarily to facilitate a business objective, part of an agreed procedure well within the contemplation of the appellant.

Rutledge cites the case of *Comm v. Goodman* (1972), 6 Ill. App. 3d 847, 286 N.E.2d 758, in which recovery was allowed an architect for services in the form of extensive developmental work in determining the feasibility of an apartment project. In that case the defendant, a real estate developer, approached the complainant requesting the work be done, but later obtained needed financing with other partners and terminated complainant's services. The trial court, dividing the work into two stages, granted relief for the first stage on the basis of a contractual agreement. It allowed quasi-contractual relief for further services in the second stage after determining that no agreement existed in respect to those benefits conferred. The appellate court concurred in upholding the decision that by " 'the preponderance of the evidence * * * plaintiff rendered services with the knowledge of the defendant; that he accepted the benefit of them.' " (6 Ill. App. 3d 847, 854.) That finding was held not against the manifest weight of the evidence. The basis of relief was the lack of any understanding for further services in the second stage, services rendered, and accepted. However, in the present case there was a clear and express understanding that no payment would be made for any services rendered other than the purchase price of the completed facility. Hence, *Comm* is factually inapposite.

More to the point is *Chandler v. Washington Toll Bridge Authority* (1943), 17 Wash. 2d 591, 173 P.2d 97, cited above. Chandler instituted an action demanding $80,000 for services performed in the preparation of estimates, surveys, maps and other items in connection with the proposed construction of a bridge across a portion of Puget Sound known as the "Tacoma Narrows." In an initial agreement with certain statutory franchise holders he had expressly waived all claim to compensation for his services and expenses unless the franchise was maintained by the commencement of construction of the bridge within a time limit set for the expiry of the franchise by the act. The statute lapsed on June 10, 1933, without any construction occurring. Further work was later done either without any contract or upon a contingent basis, but no actual construction was ever commenced by any agency with which the plaintiff had dealt. The defendant was alleged to have adopted to its use and benefit the plaintiff's estimates, information and plans when applying for Federal funds which

were granted and resulted in the bridge's construction over five years later. Recovery was denied on the basis of the waiver contained in the first agreement and the subsequent understandings upon which work was accomplished for the benefit of succeeding franchise authorities. The fact alone of a benefit conferred was insufficient in itself to compel remedial action by the court. Before relief could be granted the court held that it must appear the enrichment was unjust. (*Chandler v. Washington Toll Bridge Authority* (1943), 17 Wash. 2d 591, 73 P.2d 97, 102.) So too, the Housing Authority engaged Rutledge with the understanding detailed below in its letter of May 22, 1972.

"The Authority tentatively approves your proposal and requests that you attend a Feasibility Conference to be held on the morning of May 30th in the Department's Housing Assistance Office, 17 North Dearborn Street, Chicago, Illinois. The purpose of this Conference will be:—

1. to negotiate the purchase price of the land,
2. to discuss project design and HUD requirements, and
3. to schedule the remaining stages in the Turnkey program.

If the drawings, specifications, and price are satisfactory, they will be submitted to the Government with a request for an annual contributions contract under which the acquisition of the property will be financed. The Authority will promptly execute such contract when it is tendered by the Government.

Promptly upon the execution of an Annual Contributions Contract between the Government and the Authority, the Authority will issue to you a firm letter of Intent setting forth the conditions under which you will prepare working drawings and specifications and under which you and the Authority will enter into a Contract of Sale of the property. * * *

If this letter represents your understanding, please sign and return four copies."

The copies were signed and returned by Rutledge dated May 25, 1972. No letter of intent was ever issued, and no contract of sale was ever agreed upon. But, the services extended before and after the above-quoted letter were offered with the understanding embodied in it and the Turnkey Handbook.

Accordingly, we find no reason to disturb the holding of the court under the standards established by the *Pedrick* rule.

Affirmed.

JONES, P. J., and KASSERMAN, J., concur.