BRAYTON CHEMICALS, INC.,
Plaintiff-Appellee,

v.

FIRST FARMERS STATE BANK OF
MINIER, Defendant-Appellant.

No. 81–1545.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1981.

Decided March 3, 1982.

Harold H. Kuhfuss, Kuhfuss & Kuhfuss, Pekin, Ill., for defendant-appellant.

Gregory Alan Lewis, Moyer & Bergman, Cedar Rapids, Iowa, for plaintiff-appellee.

Before PELL and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

In a two-count complaint filed on July 30, 1979, appellee-plaintiff Brayton Chemicals, Inc. (hereinafter "Brayton") charged appellant-defendant First Farmers State Bank of Minier (hereinafter "First Farmers") with fraud and misrepresentation for failing to disclose material information which it possessed concerning Newell Soil Supplies, Inc. (hereinafter "Newell"), a Brayton customer. Following a bench trial, the district court found in favor of Brayton and entered

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

judgment in the sum of $114,556.40. We reverse in part and affirm in part.

## I.

The following statement of facts is made up nearly entirely from the findings of fact contained in the district court's decision and order. Despite arguments asserted by First Farmers to the contrary, we do not find those findings "clearly erroneous" as set forth in Fed.R.Civ.P. 52(a).

Brayton is an Iowa chemical corporation whose principal place of business is Burlington, Iowa. First Farmers is an Illinois banking corporation whose principal place of business is Minier, Illinois. An important figure in this lawsuit although not a named party is Newell, an Illinois corporation engaged in the retailing of agricultural chemicals and fertilizers.

While operating as a going concern from 1974 until April 14, 1978, Newell transacted much business with First Farmers including the maintenance of its bank accounts and the arranging of financing. Prior to June, 1977, First Farmers had extended credit to Newell which was secured by mortgages on Newell's real estate and a security interest in all of its inventory, receivables and other personal property. As of April 1, 1978, that secured loan was in a sum of over $350,000.

In June, 1977, First Farmers received financial information which indicated that Newell was experiencing operating and financial difficulties. The information projected a loss for Newell for the year of upward of $200,000. Although First Farmers was advised by Newell's new accountants that the apparent loss may have resulted only from incomplete computer data, First Farmers nevertheless was prompted by this information to advance no more new credit to Newell pending the results of an audit. This decision was made on July 20, 1977.[1] A formal audit of Newell was undertaken and the results were received by

First Farmers in October, 1977. The audit reflected substantial losses and First Farmers proceeded to finalize its earlier decision terminating any further extension of credit to Newell.

On August 7, 1977, First Farmers responded to a credit inquiry regarding Newell made by another agricultural supplier named Seed Chem, Inc. First Farmers stated that Newell was "[a] valued customer and a worthy credit risk." First Farmers also noted that Newell had been prompt and satisfactory in its payments. This response was written on a document prepared and submitted by Seed Chem which provided that "[i]nformation will be treated confidentially and is received without responsibility attaching to the company or individuals furnishing same."

Sometime in December, 1977, Newell contacted Brayton about the possibility of Brayton becoming a Newell supplier for the spring of 1978. In addition to checking Dun and Bradstreet regarding Newell's credit standing, William Portz, Brayton's credit manager, contacted Seed Chem's credit manager and inquired whether he had any information concerning Newell. In response, Seed Chem's credit manager forwarded a copy of the Newell credit report submitted to Seed Chem by First Farmers.

Testimony at trial from Portz showed that Brayton relied upon the information contained in the Seed Chem report in accepting Newell's orders and in extending credit to Newell for the goods which were to be delivered in early 1978. Three orders were received by Brayton on February 28, 1978. Delivery with credit was made in March, 1978. A fourth order was placed with Brayton on March 27, 1978. It too was a credit transaction and delivery was made on April 5, 1978.

On March 27, 1978, Portz directed a written credit inquiry to First Farmers regarding Newell. No response was ever received.

---

1. In its decision, the district court found that "[First Farmers] determined, on July 20, 1977, that it would extend no further credit to Newell until it had complete information as to Newell's financial situation." In its brief as well as in its oral argument, First Farmers states that on July 20, 1977, it made to Newell a $30,000 real

estate loan and renewed a note for $120,000 for 90 days. This court was concerned about the apparent contradiction. First Farmers explained that the loans transacted on July 20, 1977, did not involve any new or unsecured extension of credit. Therefore, the district court's finding is correct to this extent.

On April 4, 1978, Portz received a telephone call from Charles Cagley, then an assistant vice-president of First Farmers. Portz testified that Cagley initiated the business conversation by inquiring as to the amount of inventory which Brayton had shipped. The reason given by Cagley for the inquiry was that First Farmers was updating its credit line. Portz expressed his concern about Newell because of unfavorable information he had received indicating financial difficulty. Cagley responded that as far as he knew Newell was "A–1" and that he "did not feel" that there was any cause for worry. The evidence presented at trial showed that, as of April 1, 1978, Cagley knew that Newell could not meet its financial obligations. Furthermore, the evidence indicated that for some time prior to April, 1978, First Farmers had been a participant in an effort to sell Newell as an ongoing business for a price sufficient to pay all of Newell's creditors. The effort was unsuccessful.

Brayton never received from Newell the payment due of $114,566.40 for the goods it delivered. After failing on April 13, 1978, to obtain from Newell an Assurance of Payment pursuant to the Uniform Commercial Code, Portz went to Newell's place of business the next day to obtain an assurance or to remove its product from Newell's inventory. He discovered that First Farmers had taken possession of the business as mortgagee and that no property, including the goods delivered by Brayton, could be removed. All of the assets and inventory were eventually sold by May, 1978, and Newell proceeded to file a voluntary petition in bankruptcy.

The district court made several other factual findings that are important to its finding of liability in First Farmers. The evidence established a custom in the agrichemical industry for suppliers to make inquiry of their competitors as to the availability of information regarding the credit worthiness of prospective customers. Customarily, information received from such sources is accepted by the industry as an accurate reflection of credit worthiness. Local banking institutions were considered prime sources by the industry for credit evaluations. First Farmers was fully aware of this custom and the possibility that a credit report given by it to one supplier might be passed on to, accepted and used by other suppliers in the industry.

With respect to the final delivery made by Brayton on April 5, 1978, the district court found that Brayton could have stopped that delivery had it been advised by First Farmers in the April 4 Portz-Cagley telephone conversation as to Newell's true financial status as of that date.

Finally, the district court found that First Farmers profited in two ways from the goods supplied by Brayton. The first was that Newell was able to remain operating until April 14, 1978. The second was that the addition to Newell's inventory enhanced First Farmers' position as secured creditor on foreclosure by increasing the gross amount available for sale.

Based upon all of this evidence, the district court found in favor of Brayton, reasoning in part as follows:

It must be found that defendant did misrepresent, and to a greater degree did omit to disclose, material facts, with knowledge, or the means for knowledge, that the representations were made, in part, false and misleading and, in part, incomplete, and the further knowledge that justifiable reliance would be placed upon the misrepresentations, to the detriment of those who did so. The intent to induce plaintiff's reliance upon such misrepresentations is inferred from the fact that knowledge is imputable to defendant that a report to Seed Chem might be relied upon by others, and the fact that defendant, as a secured creditor, could enhance its own position by plaintiff's reliance thereon. Grossly negligent concealment is demonstrated, at the very least. In the later context of contacts between plaintiff and defendant, and specifically the April 4, 1978, Cagley conversation, there is an even greater demonstration of intent than that which arose from the fact of the Seed Chem report.

## II.

██ Under Illinois law, which neither party challenges as controlling this suit, a misrepresentation may be the basis of a charge of fraud if (1) it consists of a material fact; (2) it was false and known to be so by the party making it; (3) it was made with the intent to induce the other party to act; (4) in acting, the other party must believe and rely on the truth of the statement; and (5) the person must have a right to rely on the alleged fraudulent misrepresentation. *Almgren v. Engelland*, 94 Ill. App.3d 475, 50 Ill.Dec. 66, 418 N.E.2d 1060, 1062 (1981). *In the Marriage of Ann Bower*, 87 Ill.App.3d 324, 42 Ill.Dec. 580, 409 N.E.2d 75, 77 (1980); *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 28 Ill.Dec. 226, 390 N.E.2d 393, 403 (1979), *quoting Broberg v. Mann*, 66 Ill.App.2d 134, 213 N.E.2d 89, 91 (1965). First Farmers contends that only the first of these requirements, if any, was satisfied by Brayton. It argues that the information given to Seed Chem in the credit report was true when given;[2] that the district court's inference of intent from the industry custom ignored the plain language of the report which declared the information confidential between First Farmers and Seed Chem,[3] and that an answer supplied by Brayton to a First Farmers' interrogatory contradicted Brayton's claim of reliance on the Seed Chem report.[4] First Farmers' most vociferous argument is that Brayton had absolutely no right to rely on the Seed Chem report in view of the report's confidentiality which Brayton was or at least should have been aware of and the fact that the report was prepared approximately six months before Brayton accepted Newell's orders. Its final argument is that the April 4 telephone conversation between Portz and Cagley cannot support an action for fraud.

## III.

The district court's decision relied primarily upon the August 7, 1977 credit report supplied by First Farmers to Seed Chem and the April 4, 1978 telephone conversation between William Portz of Brayton and Charles Cagley of First Farmers. We shall address each individually.

### *Seed Chem Report*

██ As discussed earlier, this report arose from a credit inquiry made by Seed Chem (on a Seed Chem document used for this specific purpose) to First Farmers on which the Bank penned its reply that Newell was "[a] valued customer and a worthy credit risk." The first paragraph of this inquiry stated that "all information will be treated confidentially and is received without responsibility attaching to the company or to individuals furnishing same."

---

**2.** At the time of the Seed Chem report, First Farmers contends that the last audited information it possessed showed no cause for concern and in fact showed a favorable anticipated growth rate as well as a favorable potential for profitability. First Farmers acknowledges that the information received from Newell's accountants in July, 1977, showed a loss. Finding this to be unbelievable in light of the other information it possessed, it called the accountants and was told to disregard the statement and not be concerned because the reflected losses were probably due to computer problems.

First Farmers argues that based upon these facts, the information supplied in the credit report are substantially true and cannot serve as the basis for an action in fraud.

**3.** The first paragraph of the Seed Chem credit inquiry stated:

Gentlemen:

In order to complete our credit files, we will appreciate your answering the following concerning the account listed below. All information will be treated confidentially and is received without responsibility attaching to the company or individuals furnishing same. Newell had referred First Farmers to Seed Chem as a source for information.

**4.** One of the interrogatories propounded by First Farmers to Brayton was as follows:

Please state whether or not the statements made by certain officers and/or employees of First Farmers State Bank referred to in paragraph 7 of the complaint were oral or in writing.

(a) If in writing, please furnish exact copies and the dates received by you.

Brayton's response was that "[n]o written statements were received." First Farmers contends that the district court erred in not giving full weight to this interrogatory answer but rather crediting testimony at trial by Portz that the written Seed Chem credit report was relied upon.

First Farmers does not deny the existence of the industry custom for competitors to freely exchange credit information about prospective customers. It argues that this custom is overcome in this case by the plain language of the report making the information obtained confidential and removing any responsibility First Farmers exposed itself to by providing the information. The district court failed to examine this argument and never addressed the significance of the confidentiality and disclaimer or responsibility language contained in the report. We find this language very significant. Nowhere in the record does it appear that the industry custom prevails over any agreement that a supplier of credit information may have entered into with a supplier of goods which negated the applicability of the custom. Surely a supplier of information had the right to override the applicability of the industry custom in a particular instance. Otherwise, many suppliers of information would refrain from becoming involved in fear of being possibly liable to an entire industry for one erroneous credit report. First Farmers had the justified right to believe that the information it supplied to Seed Chem would go no further than Seed Chem. Seed Chem's granting of confidentiality and removing the possible threat of financial responsibility in First Farmers served as an inducement for the Bank to be more candid and helpful in supplying information. While normally First Farmers would be expected to foresee that credit information supplied to one would freely pass and be relied upon by others, where the credit report provides otherwise, especially where the guarantee of confidentiality is provided by the party requesting the information, that custom is no longer applicable and the duty to foresee is extinguished. Therefore, we conclude that First Farmers did not possess the intent to induce Brayton to act on the Seed Chem report because under these circumstances, First Farmers did not reasonably foresee that the credit report would be used by other suppliers, including Brayton.

We also find that Brayton had no right to rely on the contents of the Seed Chem report. We reach this finding on two grounds. First, it is difficult to understand how Brayton, a sophisticated business entity, can justify placing complete trust and reliance in a report specifically prepared for another supplier and which Brayton knew was confidential. Brayton has never satisfactorily answered this critical question. It merely points to the industry custom. But as discussed earlier, the language of the report would have placed any reasonable supplier on notice that normal reliance could not be given to this particular report. Nowhere does the evidence show that reasonable reliance on the custom extended to a situation such as this where specific and contrary language is used in the report. Just as it was reasonable for First Farmers to foresee that no supplier but Seed Chem would see and use the credit report, it was unreasonable for Brayton to rely on a report that precluded justified and legally protectible reliance by anyone except Seed Chem. This is especially true inasmuch as there was nothing preventing Brayton from making a direct inquiry of First Farmers regarding Newell's financial condition before extending any credit.

Our second basis rests with the length of time which elapsed between August 7, 1977, the date the report was given to Seed Chem, and February, 1978, the date Brayton relied on the report and accepted Newell's orders. An additional month passed before actual delivery on the orders was made. Certainly the length of time between the representation and the reliance upon the representation is an important fact for the court to consider in determining the reasonableness of the reliance. The longer the period of time, the greater the likelihood that justification is not present. *See Illinois Law and Practice*, Fraud ¶ 13. We have great difficulty in this case accepting a claim of justified reliance on a six month old credit report which was going to be used as a measure of a company's credit worthiness yet another month and possibly even longer into the future. The untimeliness of the report would have instilled caution in any reasonable business entity considering extending credit based on information contained therein. Our decision is further buttressed by the nearly exclusive

weight given the Seed Chem report by Brayton. The only other information sought and utilized by Brayton was supplied by Dun & Bradstreet. This fact alone demonstrates that not much care was given by Brayton to the decision of extending credit to Newell. Certainly reasonable business conduct would not be that exhibited by Brayton throughout this entire matter and it cannot be said that under all of these circumstances, Brayton had a justified right to rely on that report.

It is important to recognize that the losses Brayton has suffered were self-inflicted and could have easily been avoided. Brayton never directly contacted Newell, the central figure in this entire matter, to request financial information. Furthermore, the evidence shows that Brayton failed to direct a written inquiry to First Farmers until March 27, 1978, after delivery of the first three orders. What good the inquiry accomplished at that time is difficult to ascertain. The rule in Illinois is that a party is not justified in relying on representations when he has ample opportunity to ascertain the truth of the representations before he acts and fails to do so. *National Republic Bank of Chicago v. National Homes Construction Corp.*, 63 Ill.App.3d 920, 21 Ill.Dec. 80, 381 N.E.2d 15, 19 (1978); *Schmidt v. Landfield*, 20 Ill.2d 89, 169 N.E.2d 229, 231–32 (1960). In this case, Brayton failed to directly contact either of the two prime figures in this matter. It had every opportunity to do so but failed. Brayton preferred to rely on a six month old credit report, limited in information, marked confidential and directed to another company. We cannot find that this conduct constitutes justified reliance.

For all these reasons, we conclude that the Seed Chem credit report cannot support a Brayton action for fraud.

### Cagley Conversation

■ The district court found that had Portz been advised as to the true financial status of Newell during its telephone conversation with Cagley on April 4, the delivery of Newell's final order the next day (invoice value of $27,021.50) could have been stopped. The district court also concluded that Cagley possessed the intent to induce Portz not to take such action. We agree with the district court.

It is important to first establish that the decision to extend credit to Newell was made by Brayton long before this April 4 telephone conversation. Indeed, three of the four orders had already been delivered with the fourth en route. To claim reliance on the Cagley conversation in extending credit to Newell is therefore ridiculous. The only claim that Brayton can lodge is that Cagley's misrepresentations induced it not to stop delivery of the fourth and final order.

The record adequately supports the district court's conclusion that Cagley's statements were false and material, and that he knew his representations were such. Newell was not "A–1" and Cagley certainly believed there was some cause for worry as to whether Newell could meet its financial obligations. He also failed to disclose the fact that efforts were underway towards selling Newell, an extremely material fact that was relevant to Portz' inquiry. The record also establishes that Portz did in fact rely on Cagley's statements and had the right to rely on them. The troublesome issue is whether Cagley possessed the necessary intent. We hold that he did.

There is no dispute that the phone call originated with First Farmers and that Cagley stated the purpose of the call as an inquiry into the amount of inventory Brayton had shipped to Newell so that First Farmers could update its credit line. From this undisputed evidence, it is reasonable to conclude that at least at the beginning of the conversation, Cagley possessed no intent to induce Portz to do anything with respect to Brayton's account with Newell. The conversation, however, soon shifted to Newell's financial condition with Portz' expression of concern about Brayton's account. One is justified in inferring that Cagley made the misrepresentations to lull Brayton into a feeling of security as to Newell's ability to meet its credit obligations so that no action would be taken to protect its account. It is plain that any increases to Newell's inventory enhanced First Farmers' security interest in that in-

ventory. Had Brayton taken any action to protect its own interests, First Farmers would have suffered. There is nothing to indicate that Cagley specifically knew of the fourth order and its delivery date, but that is unimportant. Cagley's misrepresentations were intended to induce Brayton not to take any action to protect its interests. One of these actions as shown by the evidence would have been stoppage of the final delivery. Therefore, Cagley did intend to induce Portz not to stop the final delivery and all of the prerequisites to an action for fraud are satisfied.

First Farmers argues that regardless of what conclusion the court reaches with respect to this Cagley conversation, Brayton should still not be able to recover any of its losses because of its failure to take advantage of the protections provided under the Illinois Uniform Commercial Code (UCC), Ill.Rev.Stat., ch. 26, §§ 1–101 *et seq.* By utilizing the protections provided therein, Brayton could have retained a security interest in the goods it was delivering to Newell which would have taken priority over the security interest held by First Farmers. *See also Herman v. First Farmers State Bank of Minier,* 73 Ill.App.3d 475, 29 Ill.Dec. 787, 392 N.E.2d 344 (1979).

We agree that Brayton could have avoided the losses it has suffered by utilizing the UCC. That failure, however, does not preclude or preempt Brayton from pursuing an action for fraud against First Farmers. Section 1–103 of the UCC provides that:

> *Unless displaced by the particular provisions of this Act, the principles of law and equity, including* the law merchant and the law relative to capacity to contract, principal and agent, estoppel, *fraud, misrepresentation,* duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provision.

(emphasis added). First Farmers in effect argues, without authority, that Article 9 of the UCC has displaced the common law actions of fraud and misrepresentation. We reject this argument on the authority of *GNP Commodities, Inc. v. Walsh Heffernan Co.,* 95 Ill.App.3d 966, 51 Ill.Dec. 245, 420 N.E.2d 659 (1981), where the court adopted the holdings of two other courts "that an action for fraud is still available outside the Code." *Id.* at 672. *See also Hills Bank & Trust Company v. Arnold Cattle Company,* 22 Ill.App.3d 138, 316 N.E.2d 669, 671 (1974). We find the application of this principle especially appropriate in this case inasmuch as the competing security interest was held by the party who made the misrepresentations. First Farmers cannot rely on Brayton's failure to utilize the UCC where such failure was induced by its own misrepresentations.

### Conclusion

The only losses suffered by Brayton compensable in this action for fraud are those resulting from Newell's nonpayment for goods delivered on April 5, 1978. The judgment entered by the district court is therefore reversed in part, affirmed in part, and remanded with directions to enter judgment in favor of Brayton in the amount of $27,021.50, plus costs.