**NORTH AMERICAN FINANCIAL GROUP, LTD., Plaintiff,**

v.

**S.M.R. ENTERPRISES, INC., d/b/a Fantastic Sam's, and Sam M. Ross, Defendants.**

No. 83 C 3670.

United States District Court, N.D. Illinois, E.D.

Feb. 24, 1984.

Carlo E. Poli, Engerman, Erlich, Jacobs & Berman, Chicago, Ill., for plaintiff.

George D. McCrary, Hester & McCrary, Bartlett, Tenn., David L. Schiavone, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Plaintiff North American Financial Group, Ltd. ("North American"), brings a six count complaint against S.M.R. Enterprises, Inc., doing business as Fantastic Sam's ("Fantastic") and Sam Ross ("Ross"). North American is a Delaware corporation whose principal place of business is in Chicago, Illinois. Fantastic is a Tennessee corporation with its principal place of business in that state, and Ross is a citizen of Tennessee. Counts I and II are federal counts, brought respectively under section 17(a) of the Securities Act of 1933, as amended 15 U.S.C. §§ 77a *et seq.* ("1933 Act") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Counts III, IV, V and VI are based on Illinois statutory and common law: Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½, §§ 701 *et seq.* ("Franchise Act"); fraud; quantum meruit; and specific performance of an oral contract. Jurisdiction is asserted through 28 U.S.C. § 1331 pursuant to 15 U.S.C. § 77v and 18 U.S.C. § 1961; and 28 U.S.C. § 1332.

## FACTS

North American is engaged primarily in the business of raising venture capital and investing or loaning venture capital. It also engages in financial consulting. Fantastic is engaged in the business of franchising family hair care centers and centers which train franchisees to operate the hair care centers under the name of Fantastic Sam's. Ross, during the relevant period, was the president, director and principal shareholder of Fantastic.

The events giving rise to this lawsuit are curious. In the Fall of 1981, Ross contacted North American seeking capital for promotion of Fantastic's Chicago area franchise program. The capital supposedly was sought in the form of a loan to Ross rather than as a loan directly to Fantastic so that Fantastic's debt/equity ratio would be enhanced. North American refused to lend funds to Ross on that basis, allegedly because the result would mislead the Federal Trade Commission, Illinois Attorney General, potential franchisees and others. Nonetheless, North American agreed to explore other, "nonmisleading" funding methods for Fantastic.

In October of 1981, Gregory I. Kravitt ("Kravitt"), North American's president, met in Chicago with Ross. At this meeting and at a second meeting in January of 1982, Ross allegedly offered Kravitt a percentage of Fantastic stock, stock options and a chance to buy the Chicago area Fantastic franchise for $500,000.00 (collectively "Stage One deal").

During the negotiations which followed, North American claims that Ross intentionally misrepresented his past business ventures and successes expressly to induce North American into investing in Fantastic. The alleged misrepresentations include: that Ross had developed a motel and marina in Rockport, Massachusetts which later became a Holiday Inn; that Ross had opened a restaurant in Boston's financial

district with a $60,000.00 loan from Shamut National Bank which restaurant later was sold for $250,000; that Ross had operated a successful real estate business in Green Bay, Wisconsin before relocating to Tennessee due to a heart condition; that Fantastic was Helene Curtis' second largest customer and that Helene Curtis was helping Fantastic to sell franchises, including offering to purchase Fantastic from Ross; and that if North American purchased the Chicago area Fantastic franchise it could easily sell individual franchises and realize annual income in the amount of $3,800,000.00. In North American's view most of the above are false rather than exaggerations or puffings.

North American also complains that Ross omitted certain key information from the Stage One discussions: that Fantastic's need for capital fluctuated, such that no deal would be consummated unless capital was required when the transaction was mature and that unless North American sold 200 individual franchises within a two year period, its Chicago area franchise would be forfeited to Fantastic. North American further says that the defendants tendered faulty area franchise disclosure statements in violation of Illinois law.

North American alleges that it relied in good faith on the misrepresentations. As a result of its reliance, and the material omissions, North American says that it continued to negotiate with Ross, devoting substantial time and money in developing the Stage One deal, incurring travel and legal expenses and providing Fantastic with free investment counseling.

Stage One was aborted. It is unclear when North American actually learned of Ross' alleged business exaggerations and material misrepresentations or omissions. But, it is clear that North American did not back out of the deal. Rather, on July 20, 1982, Fantastic's agent George H. Carnall, II ("Carnall") withdrew the Stage One stock/franchise offer. The reason allegedly given was that Fantastic no longer needed the injection of capital which the proceeds of the area franchise would provide.

Instead of being relieved, North American apparently was disappointed. It considered alternative investment offers from Fantastic. The first such offer came on the very day that Carnall withdrew the Stage One deal. North American allegedly would have been permitted to purchase ten percent of Fantastic's stock for $250,000.00 and after one year could have purchased another 10 percent for another $250,000.00. That offer was followed about one month later with a second stock/franchise deal ("Stage Two deal"). Although the Court is unsure of its specifics, it seems that North American was offered the chance to buy 10 percent of Fantastic's stock for $50,000.00. That sum would be credited to North American for training, advertising and royalty expenses. Further, if North American accepted the Stage Two deal, it would have received an option to acquire 20 percent more of Fantastic's stock for $500,000.00.

Once again, North American claims it was duped into spending time and money in negotiations which it would not have had it known that the Stage Two deal also depended on whether Fantastic was capital-needy when all issues were resolved. North American also characterizes the Stage Two deal as fraught with material misrepresentations and omissions and violative of Illinois franchise law.

Stage Two was withdrawn by Ross, for reasons not expressed in the complaint. But, once again, a third offer allegedly was tendered during the withdrawal phone call. The "Stage Three" deal purportedly proposed that North American pay $50,000.00 for the Chicago area franchise, which sum would be applied as credit to North American for training, advertising and royalty expenses. North American "immediately accepted this third offer." Ross and Fantastic later refused to tender the Chicago area franchise arguing that no enforceable contract was made.

In support of a final, enforceable Stage Three deal, North American submits a copy of a trade journal advertisement. That advertisement invites persons eager to earn big profits as a Fantastic Sam's franchisee

to contact, among others, "one of our regional offices ... George I. Kravitt, Fantastic Sam's of Illinois." Kravitt, of course, is president of North American.

If all the allegations made by North American are true, North American likely escaped being "clipped" by Fantastic. Surprisingly, however, North American seeks specific performance. It asks this Court to force Fantastic to sell it the Chicago area Fantastic franchise under the alleged terms of the Stage Three deal. North American also wants to recover the reasonable value of its efforts uselessly expended on Stages One and Two.

The defendants' general response to North American's complaint is that the facts describe only a garden variety business deal that could not be made. In their view, each side lost time and money—risks common in the volatile world of franchisors and venture capitalists. They specifically move to dismiss on various grounds.

### 1933 Securities Act

At least three separate challenges are raised to the claims brought as fraudulent violations of section 17(a) of the 1933 Act: (1) whether a withdrawn *offer* can trigger section 17(a) liability and, if so, whether either an "offeror" or a "security" exists here; (2) lack of standing because no *sale* of a security occurred; and (3) no compensable damage. Because the Court finds that North American has no standing to sue for a section 17(a) violation, the other proposed bases for dismissing the 1933 Act count are not considered.

The starting point for determining whether North American has standing to sue under section 17(a) of the 1933 Act is a comparison between the language of that section and the language of section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) ("1934 Act"). The operative provisions of those antifraud sections of the 1933 and 1934 Acts are identical.

Section 17(a) of the 1933 Act, captioned "Fraudulent interstate transactions," provides in pertinent part

a. It shall be unlawful for any person in the *offer or sale* of any securities ...

(1) to employ any devise, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact ..., or

(3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77g. (emphasis added). Section 10(b) of the 1934 Securities Act, captioned "Manipulative and deceptive devices," provides in pertinent part

It shall be unlawful for any person ...

(b) To use or employ, in connection with the *purchase or sale* of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (emphasis added). The Commission rule applicable to section 10(b) of the 1934 Act is Rule 10b–5, which, except for its relevance to fraud in the *purchase or sale* of securities, tracks the exact prohibitory language of section 17(a) of the 1933 Act. *See* 17 C.F.R. 240.10b–5.

In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the United States Supreme Court found that a private damage action was implied under section 10(b) of the 1934 Act and Rule 10b–5, but that the right is confined to actual purchasers or sellers of securities. *See also Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356. The Court, however, "express[ed], ... no opinion on whether § 17(a) [of the 1933 Act] ... gives rise to an implied cause of action." 421 U.S. at 734 n. 6. *See also Aaron v. SEC,* 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980).

Immediately prior to the Court's decision in *Blue Chip*, Judge Will of the Northern District of Illinois held that neither the statutory nor legislative history of section 17(a) would permit an implied right of action thereunder; section 17(a) exists only to afford a basis for injunctive relief. *Reid v. Mann*, 381 F.Supp. 525 (N.D.Ill.1974). Although Judge Will noted that other courts apparently had implied a private right, all such cases involved 10b–5 claims for the same conduct. In *Reid v. Mann* only a "naked 17(a) claim devoid of any 10b–5 allegations" was presented, and the action was dismissed. *Id.* at 528.

Subsequently, the Court of Appeal for the Seventh Circuit has implied, due to the identity of the antifraud provisions of the 1933 and 1934 Acts, a private right under section 17(a) of the 1933 Act. *Daniel v. International Brotherhood of Teamsters*, 561 F.2d 1223 (7th Cir.1977), *reversed on other grounds*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). *See also Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 323–24 (1983); *Lincoln National Bank v. Herber*, 604 F.2d 1038, 1040 n. 2 (7th Cir.1979); *Schaefer v. First National Bank of Lincolnwood*, 509 F.2d 1287, 1293 (7th Cir. 1975), *cert. denied sub nom. Rodman & Renshaw v. Schaefer*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). In each of these Seventh Circuit cases, however, a section 10b–5 claim also was alleged, *i.e.,* either a purchase or sale of a security had occurred. It was, in effect, "not a terribly important question" whether the section 17(a) claims were permissible independently. *Peoria Union Stock Yard Co. v. Penn Mutual Life Insurance Co.*, 698 F.2d at 323. *See also Timberlake v. Oppenheimer & Co.*, 83 C 1295 (N.D.Ill. Sept. 30, 1983) (Hart, J.).

■ In *Sanders v. John Nuveen & Co. Inc.*, 554 F.2d 790 (7th Cir.1977) (Sanders III) the Seventh Circuit again found it unnecessary to resolve whether a "naked" violation of the 1933 Act was privately actionable. It found instead that even if a private cause of action exists under section 17(a) absent a viable 10b–5 claim, such an action would require proof of scienter. *Id.* at 795. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *reversing* 503 F.2d 1100 (7th Cir. 1974) (Sanders I). No scienter was established under the facts of Sanders III. Thus, this Court must determine without clear direction if North American can sue for damages for fraud in the *offer* of a security absent an accompanying sale or purchase. *But see Frischling v. Priest Oil & Gas Corp.*, 524 F.Supp. 1107 (N.D.Ill. 1981) (in dicta, court observes no sale required for private section 17(a) action).

■ The defendants' view is that failure to imply a private action for fraud incident only to a securities offer is to write out the "offer" provision of section 17(a). The argument is appealing, but faulted by the legislative history of the 1933 Act. Apparently the primary purpose of the 1933 Act was to permit fraud in a security offering to be remedied by *injunction*. *See S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir.) (*en banc*), *cert. denied sub nom. Coates v. S.E.C.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968) (Friendly, J., concurring). In an often quoted section of the *Texas Gulf Sulphur* opinion, Judge Friendly stated

[T]here is unanimity among the commentators, including some who were in a peculiarly good position to know, that § 17(a)(2) of the 1933 Act—indeed the whole of § 17—was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability, and was never believed to supplement the actions for damages provided by §§ 11 and 12. (citations omitted) ... When the House Committee Report listed the sections that "define civil liabilities imposed by the Act" it pointed only to §§ 11 and 12 and stated "[t]o impose a greater responsibility ... would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public." H.Rep. No. 85, 73d Cong., 1st Sess. 9–10 (1933).

*Id.* at 867. Professors Loss and Ruder agree. *See* 3 Loss, *Securities Regulation* 1784–85 (2d ed. 1961); Ruder, "Civil Liability under Rule 10b–5: Judicial Revision of Legislative Intent?" 57 *Nw.U.L.Rev.* 627, 656 (1963).

The arguments marshalled by Judge Friendly and Professors Loss and Ruder have been weakened by decisions of intermediate appellate courts; the arguments, however, are not completely discredited. It is quite possible that Congress intended by section 17(a) to remedy fraud in an offering by injunction while simultaneously permitting a private damage action for a fraudulent sale of a security. Such analysis leaves the word "offer" within section 17(a) and accommodates the many section 17(a) cases which imply a private right of action tied to a 10b–5 violation. This Court is not persuaded to do otherwise.

*United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), relied upon by North American, is not to the contrary. While *Naftalin* makes quite clear that section 17(a) merits broad interpretation and is aimed squarely at fraudulent offerings, *Naftalin* never considered whether a private party could recover damages thereunder. It is a criminal action which addressed and affirmatively answered whether section 17(a) prohibits frauds (in offerings or sales) on brokers as well as on investors.

There is no suggestion in this case that an actual sale of a security occurred. The behavior complained of in Stages One and Two are fraudulent securities offerings. Assuming *arguendo* that a franchise is a security, Stage Three also is concerned only with an alleged fraudulent offering. Absent allegations that would, if true, violate Rule 10b–5, the Court finds that damages may not be recovered for a section 17(a) fraudulent offering. North American has no standing to sue under section 17(a) of the 1933 Act and Count I is dismissed.

### RICO and Common Law Fraud

North American's RICO allegations are premised on an alleged pattern of racketeering activity, evidenced by at least two predicate offenses—mail or wire frauds. 18 U.S.C. § 1961(1)(B); 18 U.S.C. §§ 1341 and 1343. According to North American, the underlying fraudulent behavior can be established either from the fraudulent securities offerings or the common law fraud alleged. Since North American has no standing to sue for securities fraud under section 17(a) of the 1933 Act, the common law fraud allegations must be sufficiently stated or the RICO claim will fail.

In Illinois, common law fraud generally means anything calculated to deceive, whether positive acts, omissions or concealments, where a legal or equitable duty is breached causing damage to the plaintiff. *Majewski v. Gallina,* 17 Ill.2d 92, 160 N.E.2d 783 (1959); *Carey Electric Contracting, Inc. v. First National Bank of Elgin,* 74 Ill.App.3d 233, 30 Ill.Dec. 104, 392 N.E.2d 759 (2d Dist.1979). There is, however, no technical or general rule to determine what facts constitute fraud; the special facts of each case must be considered. *Id.*

Whatever the facts, North American must plead—and the facts and reasonable inferences therefrom must minimally support—the required elements of a fraud claim. The elements are not in dispute. North American must show (1) that the defendants made a false representation of a material past or existing fact; (2) which was known to be false when made; (3) the misrepresentation must have been made intentionally to induce the plaintiff to act; (4) the plaintiff must rely on the misrepresentation and have the right to rely; and (5) the plaintiff must be injured as a result of such reliance. *See, e.g., Brayton Chemicals, Inc. v. First Farmers State Bank of Minier,* 671 F.2d 1047 (7th Cir.1982); *Soules v. General Motors Corp.,* 79 Ill.2d 282, 37 Ill.Dec. 597, 402 N.E.2d 599 (1980).

In addition, Illinois case law has qualified the elements in a number of ways relevant here. For example, the requirement of ordinary care in discovering the truth or falsity of the representations is imposed on the party claiming fraud in

order to establish justifiable reliance. *See, e.g., City of Evanston v. Connelly*, 73 Ill. App.3d 890, 29 Ill.Dec. 654, 392 N.E.2d 211 (1st Dist.1979). The background, special expertise or education of the plaintiff also may be considered incident to the reasonable reliance element. *See, e.g., Parker v. Arthur Murray, Inc.*, 10 Ill.App.3d 1000, 295 N.E.2d 487 (1973).

■ Regarding the requirement that the misrepresentation must be a past or present fact, usually mere expressions of opinion of future occurrences, especially of future profitability, are not actionable. *See, e.g., Peterson Industries, Inc. v. Lake View Trust and Savings Bank*, 584 F.2d 166 (7th Cir.1978); *Ziskin v. Thrall Car Manufacturing Co.*, 106 Ill.App.3d 482, 62 Ill.Dec. 255, 435 N.E.2d 1227 (1st Dist. 1982); *Younger v. Revelle*, 78 Ill.App.3d 1, 33 Ill.Dec. 888, 397 N.E.2d 221 (5th Dist. 1979).

■ Finally, regarding the materiality requirement, a misrepresentation, regardless of how intentional, cannot be material if it makes no difference. The fact must be essential to the inducement of the plaintiff's action. The concealed fact must be such that had the plaintiff known the truth, he would have acted differently. *See, e.g., Giacomazzi v. Urban Search Corp.*, 86 Ill.App. 429, 41 Ill.Dec. 123, 407 N.E.2d 621 (1st Dist.1980); *Perlman v. Time, Inc.*, 64 Ill.App.3d 190, 20 Ill.Dec. 831, 380 N.E.2d 1040 (1st Dist.1978).

■ Applying the general rules to the facts alleged here, it is apparent that North American's common law fraud claim, and derivatively its RICO claim, must be dismissed. First, the Court notes that North American is a sophisticated investor. North American's business is locating and lending venture capital. It is manifest that the process of finding investment opportunities or capital for itself or others must include the investigation and analysis of the prospective venture. Many of the misrepresentations cited by North American relate to Ross' allegedly false business experience and success. The facts of those

enterprises likely were discoverable by North American before it entered the Stage One negotiations. It certainly is reasonable to assume that an entity planning to commit as much as one half million dollars in an unknown enterprise would check out the president of that enterprise. There is no suggestion that Ross prevented North American from learning the facts. Nor may North American merely close its eyes and expect this Court to compensate it for any lost expenses and time. *See Peterson Industries, Inc. v. Lake View Trust and Savings Bank, supra.*

North American clearly had no right in Stages Two and Three to rely on the alleged material omissions relating to the clinching of a final deal only if Fantastic happened to need capital when all pieces came together. Stage One was aborted specifically because Fantastic did not then need the proceeds of the Chicago area franchise. That is North American's allegation and, regardless of whether such reliance was reasonable in Stage One, Stages Two and Three progressed at North American's risk.

It also is irrelevant that the defendants told North American that, as the owner of the Chicago area franchise, it could sell individual franchises and realize an annual income in excess of three million dollars. That misrepresentation is an opinion of future profitability and unactionable.

Finally, and most significantly, North American cannot show material misrepresentations or omissions. As noted, a misrepresentation is material only if it is essential to inducing reliance, *i.e.*, if North American had known the truth it would have acted differently. Now, North American knows "the truth." Nonetheless, it wants to go through with some version of the deal. It certainly cannot be concerned with the truth or falsity of Ross' professed business experience or his "false" promises of financial gains. The logical conclusion is that the misrepresentations make no difference.

Based on these facts, the Court finds that no common law fraud claim is stated

here. That claim is dismissed. Thus, no mail or wire fraud could be proved. Accordingly, it also is unnecessary to consider whether the other technical elements of a civil RICO claim have been properly stated. The RICO count is dismissed.

## Specific Performance

In seeking specific performance, North American assumes the existence of a final, binding oral agreement, whereby North American would purchase the Chicago area Fantastic Sam franchise. Contrary to North American's arguments, however, the indicia of such a contract are missing. An oral agreement will be enforced only if its terms are sufficiently defined and certain so that the promises and performance required of each party are known to the Court. *Abrams v. Illinois College of Podiatric Medicine*, 77 Ill. App.3d 471, 32 Ill.Dec. 680, 395 N.E.2d 1061 (1st Dist.1979).

A franchise generally is the product of an elaborate agreement, Glickman, *Franchising*, § 2.01 at p. 2–2.1, but the only term alleged here is the purported price. While it is true that the negotiation process spanned 18 months, North American's pleadings prove that no objective meeting of the minds occurred on the terms of deals one or two. Thus, contrary to North American's suggestion, the Court could not graft terms from Stages One or Two onto the Stage Three franchise arrangement sought. The fact that the defendants may have wrongfully used Kravitt's name (a nonparty) and North American's address in a promotional advertisement, does not establish a contract.

Even were the skeleton of a contract traced, there is absolutely no precedent for granting specific performance of a franchise contract. A franchise agreement of the type contemplated here is at least partially a contract for personal services. "[T]he franchisee undertakes to conduct a business or sell a product or services in accordance with methods and procedures prescribed by the franchisor and the franchisor undertakes to assist the franchisee through advertising, promotion, and other services." Glickman, *Franchising*, § 2.01, p. 2–2.1. *See also People ex rel. Scott v. Cardet International, Inc.*, 24 Ill.App.3d 740, 321 N.E.2d 386 (1st Dist.1974) (area franchise is for goods and services) (brought under Illinois Consumer Fraud Act, Ill.Rev.Stat. ch. 121½, §§ 261 *et seq.*).

North American's plan to buy an area franchise instead of an individual franchise does not indicate that *only* a licensing of Fantastic's trade name would have occurred. The earlier, unconsummated deals, both for the Chicago *area* franchise, sought a fee in exchange for, *inter alia*, training and advertising. The allegation is that the third deal also required the defendants to train North American and advertise for its benefit. Although the pleadings do not indicate "training" for what, the Court assumes that either training to operate a hair center or training to teach others to operate a hair center was intended. Either situation would require the defendants to provide personal, specialized services to North American for an unspecified time.

If specific performance were granted, the Court would be placed in the untenable situation of a long-term supervisor, judging the quality of training and overseeing the breadth and efficacy of advertising. For that reason, it is hornbook law that a contract for personal services will not be specifically enforced as contrary to public policy. *See Zannis v. Lake Shore Radiologists*, 73 Ill.App.3d 901, 29 Ill.Dec. 569, 392 N.E.2d 126 (1st Dist.1979), and the cases cited therein. Specific performance is denied.

## Illinois Franchise Disclosure Act

In order to civilly enforce the provisions of the Franchise Act, a private ("franchisee") may recover damages only against the franchisor who made the sale "or participated in any way in making such *sale*." Ill.Rev.Stat. ch. 121½, § 721 (emphasis added). A "franchisee" is defined as "a person to whom a franchise is granted." Ill.Rev.Stat. ch. 121½, § 703(2). No sale of or agreement to sell the Chicago

area franchise is found, no franchise has been granted. North American has no standing to sue under the Franchise Act. That count is dismissed.

## Quantum Meruit

 Finally, North American claims that it should be compensated for the reasonable value of the financial consultation services it allegedly provided to Fantastic and for Fantastic's use of its offices and telephone number during the negotiations. Where a party seeks reimbursement on a quasi contract theory, he must prove that another party received valuables which equity will not permit to go uncompensated. Under the proper fact situation, the defendant must pay, although no contract existed, for the retained goods, services, or cash. *Board of Highway Commissioners v. City of Bloomington,* 253 Ill. 164, 97 N.E. 280 (1911).

 The context in which particular services are rendered and any unjust benefits accrued is critical. Thus it is the status of the parties during the "benefit" period which is key, and not subsequent changed circumstances. *Bloomgarden v. Coyer,* 479 F.2d 201, 212 (D.C.Cir.1973); *Rutledge v. Housing Authority of East St. Louis,* 88 Ill.App.3d 1064, 44 Ill.Dec. 176, 411 N.E.2d 82 (5th Cir.1980).

 Courts generally have refused to find unjust enrichment from services rendered without pay where the services were given during the negotiation phase of a commercial undertaking.

> Where preliminary services are conferred for business reasons, without the anticipation that reimbursement will *directly* result, but rather, with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations related thereto, quasi contractual relief is unwarranted. (emphasis added).

*Rutledge v. Housing Authority,* 88 Ill. App.3d 1064, 44 Ill.Dec. at 180, 411 N.E.2d at 86. *See also Bloomgarden v. Coyer,* 479 F.2d at 210–212; *Maple Island Farm, Inc. v. Bitterling,* 209 F.2d 867, 872, *cert.*

*denied,* 348 U.S. 882, 75 S.Ct. 123, 99 L.Ed. 694 (1954).

The Court initially notes that the benefits allegedly conferred here are not well stated. It is unknown whether North American provided the defendants with financial counseling separate and apart from the various deals considered between the parties. Nor does the Court know whether and to what extent Kravitt or North American actually received inquiries from prospective franchisees due to the defendants' advertisement.

However, even if more specificity were given or Kravitt were a party, this case is not different than *Bloomgarden* and *Rutledge.* North American and the defendants were involved in protracted business negotiations, one aim of which was to make North American the Chicago area franchisee of Fantastic Sam hair salons. North American's behavior during the various stages and now makes clear that it was anxious to become the area franchisee. It therefore is likely that it financially advised the defendants gratuitously on all manners of investment or capitalization in the hope of garnering favor and securing the franchise. Furthermore North American does not allege any arrangement or conversation whereby the defendants agreed to compensate it *directly* for services rendered to the defendants irrespective of any deal to be made.

 Regarding the use of Kravitt's name, even if North American could claim a loss therefrom, it is probable that Kravitt agreed to lend his name so that interest among potential individual franchisees could be locally stimulated. If the deal for the area franchise had matured, such interest would have inured to North American's benefit. Nothing in the facts alleged and the reasonable inferences indicate that equity demands payment from the defendants to North American. Each side lost money and time; each side must absorb its losses. The claim to recover in quantum meruit is dismissed.

IT IS THEREFORE ORDERED that defendants' motion to dismiss this complaint is granted.