C. Christopher DUNNAVILLE

v.

McCORMICK & COMPANY, INC., et al.

No. CIV. L–95–2341.

United States District Court,
D. Maryland.

Sept. 29, 1998.

Charles S. Fax, and Barron L. Stroud, Jr., of Baltimore, MD, for plaintiffs.

Lewis A. Noonberg, and Leonard L. Gordon, of Baltimore, MD, for defendants.

## MEMORANDUM

LEGG, District Judge.

In 1994 and 1995, the plaintiff, C. Christopher Dunnaville, negotiated with representatives from defendant McCormick & Company, Inc. ("McCormick"), to purchase McCormick's subsidiary, defendant Golden West Foods, Inc. ("Golden West"). According to Dunnaville, McCormick's representatives assured him that he "had a deal." Based upon these assurances, Dunnaville contends that he was instrumental to successful efforts to save Golden West's largest customer. The customer, a buying group for Burger King franchises, had been contemplating granting an exclusive buying arrangement to one of Golden West's competitors.

After a number of fits and starts, the negotiation fell through and McCormick sold Golden West to another buyer who offered better terms. Dunnaville responded by bringing suit against McCormick, Golden West, McCormick's broker J.H. Chapman Group, Ltd. ("Chapman"), and John W. Loeb, a Chapman partner. In his Complaint, Dunnaville raised many claims, among others, for tortious interference with contractual relations, unjust enrichment, and quantum meruit.[1]

After a series of referrals to a magistrate judge for settlement proved unproductive, the defendants filed a Motion for Summary Judgment. Because the parties have comprehensively briefed the issues, the Court will dispense with a hearing. *See* Local Rule 105.6 (D.Md.1997). For the reasons set forth below, this Court shall, by separate Order, GRANT the Motion for Summary Judgment with respect to all claims and ENTER JUDGMENT in favor of the defendants.

Simply put, the negotiations between Dunnaville and McCormick expressly contemplated that no binding commitments would be formed until a final written agreement was signed, which never occurred. Moreover, at the time negotiations broke off many important terms, including the price Dunnaville would pay and the financing McCormick would provide, remained up in the air. McCormick never agreed to compensate Dunnaville for his efforts to save the Burger King business. It is also clear that Dunnaville sought to retain Burger King as a Golden West customer for his own reasons: (1) to enhance the value of the asset he wished to purchase, and (2) to persuade McCormick to accept a deal in which all of the purchase price save a small down payment would be raised from future profits of Golden West. The Burger King account was of crucial importance to the business prospects of Golden West.

While it was negotiating with Dunnaville, McCormick never agreed not to negotiate with other prospective purchasers, and Dunnaville's proposal was overtaken by a better offer that McCormick was free to accept. Based upon the record, no reasonable jury could find otherwise and summary judgment must be granted to the defendants.

## I. Background

In 1994, McCormick decided to sell off its subsidiary corporation, Golden West. (*See* Pl.'s Part. Opp'n Defs.' Mot. Summ. J. ("Part. Opp'n") Ex. A, Dep. Carroll D. Nordhoff ("Nordhoff Dep.") at 14–15.) Golden West manufactures food products for use in fast food restaurants; its primary products are onion rings and French toast sticks that it supplies to Burger King franchises.[2] (*See*

---

1. Diversity jurisdiction is present, 28 U.S.C. § 1332 (1998), because Dunnaville is a resident of New York, none of the defendants are "citizens" of New York for diversity purposes, and

Dunnaville alleged damages in excess of the jurisdictional minimum. (*See* Compl.)

2. To be accurate, Golden West sells its products to Restaurant Services, Inc. ("RSI"), a purchas-

Nordhoff Dep. at 9.) In 1993, for example, Golden West's sales were approximately $24 million; sales to Burger King accounted for roughly one-third of that total. (*See* Nordhoff Dep. at 10.)

On or around October 11, 1994, Dunnaville, a vice president and financial consultant at the investment firm Smith Barney, read in the *Wall Street Journal* of McCormick's plan to sell or close Golden West. (*See* Mot. Summ. J., Dep. C. Christopher Dunnaville ("Dunnaville Dep.") at 30.) Dunnaville contacted McCormick to express his interest; McCormick put Dunnaville in contact with its broker, Chapman. (*See* Dunnaville Dep. at 40.)

David Epstein, the Chapman representative with whom Dunnaville first spoke, was initially skeptical that Dunnaville, as an individual "financial" investor, as opposed to an established food service company, would be an appropriate buyer for Golden West. (*See* Dunnaville Dep. at 41.) Dunnaville, however, attempted to "put a different spin on the whole situation":

> And I said to him, Well, suppose I told you that I was a minority, an African American individual, that there was a $5 billion school lunch program that was looking for minority individuals, that the NAACP had just signed a fair-share agreement with Denny's restaurant and there were other companies, fast-food companies, that were looking to do business with minority suppliers, that there was a very high likelihood that if this company were sold to a minority individual that in fact it would become the first minority-owned frozen food manufacturer in the United States.

(Dunnaville Dep. at 41–42.)

At the time, Burger King had committed to raising the percentage of its purchasing from minority- and women-owned businesses. (*See* Colabuono Dep. at 9.) As early as September 1994, Burger King had informed McCormick and Golden West that it would

look favorably upon the sale of Golden West to a minority owner. (*See* Mot. Summ. J., Dep. Carroll D. Nordhoff ("Nordhoff Dep.") at 82; Dep. John W. Loeb ("Loeb Dep.") at 17; Metz Dep. at 35.) In fact, as Dunnaville learned, the possibility existed that Burger King might assist a prospective minority purchaser in the acquisition of Golden West, by offering to invest or to provide purchase money loans to the minority bidder. (*See* Dunnaville Dep. at 144–48.)

Shortly after his conversation with Epstein, Dunnaville signed a confidentiality agreement with Chapman, and Chapman sent Dunnaville a memorandum describing the Golden West offering. (*See* Dunnaville Dep. at 42.) After retaining legal and accounting help, Dunnaville began conducting due diligence and assembling the particulars of his offer. (*See* Mot. Summ. J. Ex. 2, Letter from Dunnaville to Loeb of 11/4/1994, at 2.) In November, Dunnaville initiated discussions with John W. Loeb, a Chapman partner, regarding the specifics of his potential purchase of Golden West. (*See id.*)

Negotiations between Dunnaville on the one hand and Chapman's Loeb and McCormick's Carroll Nordhoff on the other continued through November and December 1994. Dunnaville traveled to Virginia to meet representatives from Golden West and McCormick, and later traveled to Florida to meet Burger King representatives. Dunnaville's discussions with Burger King were positive, and Dunnaville apprised McCormick via Nordhoff of the progress he was making.

On or around December 20 of that year, however, Dunnaville spoke to representatives from RSI, the Burger King franchisees' purchasing cooperative. RSI expressed dissatisfaction with Golden West's past performance and identified a competitor that was providing better and cheaper service. (*See* Mot. Summ. J. Ex. 4, Memorandum from RSI's Moullet to Burger King's Pinckney of 12/22/1994; Dunnaville Dep. at 302 & Dep. Ex. 25 (confirming that the RSI memoran-

---

ing cooperative representing the Burger King franchises. (*See* Mot. Summ. J., Dep. Scott L. Colabuono ("Colabuono Dep.") at 6; Part. Opp'n Ex. B, Dep. Steen A. Metz ("Metz Dep.") at 17.) Understandably, Burger King exerts considerable influence over the cooperative's purchasing deci-

sions. Dunnaville dealt both with Burger King and the purchasing cooperative. For sake of convenience, this Memorandum will occasionally refer to the purchasing cooperative RSI as "Burger King," despite this distinction in corporate identity.

dum accurately summarizes his conversation with RSI).) In this conversation, Dunnaville learned:

- that Golden West's share of RSI's business had shrunk from more than 50% to approximately 30% over the previous five years;
- that RSI preferred the service it received from Golden West's primary competitor over the service it received from Golden West;
- that Golden West's competitor had undercut Golden West's prices by close to ten percent;
- that RSI was unwilling to guarantee any volume of business to Golden West after its contract expired in August 1995; and
- that because McCormick appeared ready to sell or to close Golden West, RSI had already begun negotiating an "exclusive," or sole source contract with Golden West's competitor.

(*See* Mot. Summ. J. Ex. 4.)[3]

Shaken by this conversation, Dunnaville contacted McCormick's Nordhoff and said that he was now offering $6.7 million for Golden West, which represented a reduction from his previous price. (*See* Dunnaville Dep. at 186.)[4] Dunnaville also explained that he now wanted McCormick to "have some skin ... in the game," meaning that he wanted McCormick "either [to] take back some financing or something along those lines ... [so] that they would have an interest" ongoing in Golden West. (*See* Dunnaville Dep. at 190–91.) Specifically, Dunnaville was now proposing that McCormick finance $2 million of the purchase price; after assuming Golden West's debt obligations, such financing would mean that Dunnaville would pro-

vide just $200,000 in up-front cash toward the purchase of Golden West.[5] (*See id.*) Nordhoff asked Dunnaville to put his offer in writing. (*See* Dunnaville Dep. at 194.)

Dunnaville did so in a letter termed a proposed "Agreement in Principle." (*See* Mot. Summ. J. Ex. 5, Letter from Dunnaville to Nordhoff of 12/30/1994.) While Dunnaville asked Nordhoff to countersign the document, the Agreement explicitly states that it created no binding commitments with respect to the proposed acquisition and that such a commitment would be created only by the execution of a definitive acquisition agreement. Paragraph 8 of the proposed Agreement states:

> It is understood that this Agreement in Principle, when executed by you, merely constitutes a statement of mutual intentions with respect to the proposed acquisition, does not contain all matters upon which agreement must be reached in order for the proposed acquisition to be consummated and, therefore, *does not constitute a binding commitment with respect to the proposed acquisition itself. A binding commitment with respect to the proposed acquisition itself will result only from the execution of a definitive acquisition agreement, subject to the terms and conditions expressed therein.*

(*See* Mot. Summ. J. Ex. 5 at ¶ 8.)

Despite this broad disclaimer, the Agreement sought to impose several interim conditions upon McCormick. Under one such term, McCormick would have agreed not "to solicit or negotiate, directly or indirectly, with any third party to acquire any of the capital stock of Golden West or a substantial portion of any of its assets." (*See* Mot. Summ. J. Ex. 5 at ¶¶ 4, 8.) But, none of these

---

3. RSI's representative addressed these issues in a memorandum to Burger King's "diversity affairs" representative, with whom Dunnaville had met just days earlier. (*See* Dunnaville Dep. at 144.)

4. It is undisputed that Dunnaville was the first to inform McCormick both of RSI's dissatisfaction with Golden West and of RSI's intention to drop Golden West as a supplier. During this time, however, McCormick was comparing Dunnaville's proposal with the alternative of closing

Golden West altogether. (*See, e.g.,* Mot. Summ. J. Exs. 7 & 8.)

5. The "financing," according to Dunnaville's proposal, would take the form of a fifteen-year installment note for $2 million payable in annual installments of $133,000, without interest or security. (*See* Mot. Summ. J. Ex. 5, Letter from Dunnaville to Nordhoff of 12/30/1994.) Such a deal therefore essentially made McCormick's payment for Golden West contingent upon Dunnaville's long-term success running the company.

terms ever went into effect; it is undisputed that neither Nordhoff nor any other representative for McCormick ever signed the proposed Agreement.

At the same time that Dunnaville put forward his new proposal, he also offered, capitalizing on his new contacts with the Burger King organization, to dissuade RSI from granting an exclusive purchasing agreement to Golden West's competitor. Dunnaville claims that he made this offer of assistance contingent on the proviso that he "had a deal" regarding the purchase of Golden West. (*See* Dunnaville Dep. at 187, 191.) Dunnaville recited this offer in the cover letter accompanying the proposed "Agreement in Principle." (*See* Part. Opp'n Ex. K, Letter from Dunnaville to Nordhoff of 12/30/1994 at 3.) The letter stated,

> as mentioned, in order to try to retain the Burger King account for Golden West, I would need to make presentations to Burger King and RSI in the very near future.
>
> Additionally, I have asked Burger King to invest the funds necessary to bring Golden West Foods' operations up to speed ($1 million). However, in order to move forward, I need to have an agreement from McCormick in principal, before I make any additional presentations.

(Id.)

Dunnaville and Nordhoff spoke again on January 10, 1995. Dunnaville claims that Nordhoff orally confirmed that they "had a deal" (*see* Dunnaville Dep. at 6–7); Nordhoff denies having made any such statement (*see* Nordhoff Dep. at 152–53). Regardless, it is undisputed that Nordhoff did inform Dunnaville that certain terms Dunnaville had proposed were unacceptable. Specifically, Nordhoff said that Dunnaville would have to provide more cash up front, would need to shorten the term of the note, and would need to pay interest on the note. (*See* Nordhoff Dep. at 151–54; Dunnaville Dep. at 7–10.) Nordhoff referred Dunnaville to Chapman's

Loeb to work out the disputed terms. (*See id.*)

Dunnaville negotiated with Loeb. Although they reached substantial agreement on some terms, other remained unresolved. Loeb sent a memorandum to Dunnaville on January 12 confirming their conversations, concluding: "When can we expect a new letter of intent now that there appears to be agreement?" (*See* Part. Opp'n Ex. N, Memorandum from Loeb to Dunnaville of 1/12/1995 at 2.) Dunnaville sent no further letter of intent, proposed agreement in principle, or any other form of written offer until March 15, 1995. (*See* Dunnaville Dep. at 228–29; Mot. Summ. J., Dep. David Robbins ("Robbins Dep.") at 59–65.)

In the interim, Dunnaville began discussions with Burger King in an effort to prevent RSI from granting the exclusive purchasing agreement to Golden West's competitor. He returned to Florida to make a detailed proposal to Burger King management. (*See, e.g.,* Dunnaville Dep. at 234–42.)[6] During these discussions, Dunnaville kept Nordhoff apprised of his progress, in addition to advising Golden West's president on the status of negotiations with RSI and encouraging Golden West to submit proposals. (*See* Dunnaville Dep. at 244, 296.) These efforts met with some success, and, on the recommendation of Burger King, RSI agreed to table its consideration of the exclusive purchasing agreement pending McCormick's disposition of Golden West. (*See* Dunnaville Dep. at 310–11.)

While his negotiations with Burger King were productive, Dunnaville's own proposal for the purchase of Golden West was foundering. On March 9, McCormick's Executive Committee considered and rejected Dunnaville's offer. (*See* Mot. Summ. J. Ex. 11.) This was not a final rejection, however, as the Executive Committee authorized Nordhoff to bargain further in search of a better deal. (*See* Nordhoff Dep. at 211–13.) The terms sought by the Executive Committee

---

**6.** Dunnaville also informed Burger King that McCormick owned the patent for the process used to create the onion rings that both Golden West and its competitor supplied and that Golden West's competitor operated under a revocable

license from McCormick. (*See, e.g.,* Part. Opp'n Ex. T.) It is clear that this information caused Burger King substantial pause before granting Golden West's competitor an exclusive purchasing agreement.

would include, *inter alia,* another increase in Dunnaville's cash offer, bringing that total to $400,000, and a security interest in Golden West's assets. (*See* Mot. Summ. J. Ex. 12.)

On March 15, Dunnaville's attorney sent Nordhoff a revised proposed Agreement in Principle. (*See* Mot. Summ. J. Ex. 13.) Again, the proposed Agreement in Principle included the language in Paragraph 8 making explicit that it was not a "binding commitment with respect to the proposed acquisition itself." (*See id.* at ¶ 8.) After examining the document, Nordhoff found that it still did not conform to the Executive Committee's requirements. Nordhoff drafted changes and sent them back to Dunnaville. (*See* Nordhoff Dep. at 220–21; Mot. Summ. J. Ex. 14.) Nordhoff's revised proposal, too, stated explicitly that it was not binding. (*See* Mot. Summ. J. Ex. 14 at ¶ 10.) It is also undisputed that Dunnaville did not sign Nordhoff's revised proposal.

Instead, Dunnaville and his attorney proposed more new terms, including, for the first time, the possibility of paying Dunnaville a transaction or breakup fee. ·(*See* Mot. Summ. J., Dep. Robert W. Skelton ("Skelton Dep.") at 44–49; *see also* Dunnaville Dep. at 38–39 (confirming that he had no discussion regarding a transaction fee with Nordhoff, or being reimbursed for his out-of-pocket expenses); Mot. Summ. J. Ex. 1, Facsimile from Nordhoff to Dunnaville of 3/24/1995, at 1 (noting that McCormick finds unacceptable Dunnaville's "new" proposal to be paid a transaction or break-up fee).) Nordhoff responded by outlining in writing the points of contention between the parties. (*See* Mot. Summ. J. Ex. 1.)

Dunnaville's attorney continued intermittent negotiations with McCormick over the next several weeks. By April 10, 1995, however, a McCormick representative informed him that. a new bidder had approached McCormick with a more attractive offer. (*See* Skelton Dep. at 60.) The new bidder, also an African–American, had first expressed interest in acquiring Golden West on March 31, 1995. (*See* Mot. Summ. J., Dep.

Frank B. Brooks at 67.) On April 14, 1995, McCormick entered a "letter of intent" with this new bidder for a proposed sale of Golden West for $6.7 million, including a cash payment of over $2 million. (*See* Mot. Summ. J. Ex. 16.)

Dunnaville subsequently brought the instant suit, alleging that (i) McCormick used him as a "stalking horse" in order to preserve its account with Burger King, and (ii) McCormick had unfairly reneged on its oral assurances that "he had a deal" regarding the purchase of Golden West.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be entered in favor of a moving party when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Estate of Kimmell v. Seven Up Bottling Co. of Elkton, Inc.,* 993 F.2d 410, 412 (4th Cir.1993). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for · the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, when applied to the substantive law, the outcome of the litigation is affected. *Strauss v. Peninsula Reg'l Med. Ctr.,* 916 F.Supp. 528, 530 (D.Md.1996). To satisfy the requirements for summary judgment, a moving party is not required to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party need only show the "absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548.[7]

Rule 56(e) states further that the nonmoving party cannot rest upon the pleadings but

> must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

> (citing *Kirkpatrick v. Consolidated Underwriters,* 227 F.2d 228 (4th Cir.1955).))

---

7. In his opposition, Dunnaville ignores the *Celotex* and *Anderson* decisions and cites older, questionable precedent. (*See* Part. Opp'n at 19–20

Fed.R.Civ.P. 56(e). To establish the existence of a genuine issue of material fact, the non-moving party must come forward with "significant probative evidence." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Specific facts in evidence must support the claims and demonstrate that a genuine issue for trial exists. *Kimsey v. Myrtle Beach,* 109 F.3d 194, 195 (4th Cir.1997). "Merely colorable" or "not significantly probative" evidence is insufficient to withstand summary judgment. *Thompson Everett, Inc. v. National Cable Advert., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995).

In *Thompson Everett,* the Fourth Circuit made clear that the showing required of the non-moving party is a substantial one:

> While it is axiomatic that Rule 56 must be used carefully so as not to improperly foreclose trial on genuinely disputed, material facts, the mere existence of some disputed facts does not require that a case go to trial. The disputed facts must be material to an issue necessary for the proper resolution of the case, and the *quality and quantity of the evidence* offered to create a question of fact *must be adequate to support a jury verdict.*

*Id.* at 1323 (emphasis added). Of course, in determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

### III. Discussion

On October 15, 1997, this Court approved a Stipulation of Dismissal in which Dunnaville voluntarily dismissed several of his claims. In addition, when subsequently filing his partial opposition to defendants' Motion for Summary Judgment, Dunnaville did not op-

pose summary judgment with respect to two more of his claims.[8] As a result, the following claims remain in the case:

* against McCormick for "breach of non-disclosure and no-shopping agreement" (Count VII), promissory estoppel (Count XII), unjust enrichment (Count XIV), and quantum meruit (Count XVI);

* against Golden West for unjust enrichment (Count XV) and quantum meruit (Count XVII);

* against Chapman for "tortious inducing breach of contractual relationship" (Count VIII); and

* against Loeb for "inducing breach of contractual relationship" (Count IX).

As the following discussion explains, none of these claims have merit.

### A. Claims against McCormick and Golden West

#### 1. Promissory Estoppel (McCormick)

■ First, Dunnaville cannot sustain a claim against McCormick for promissory estoppel. Under Maryland law,[9] a plaintiff must demonstrate: (i) a clear and definite promise; (ii) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (iii) which does induce actual and reasonable action or forbearance by the promisee; and (iv) causes a detriment which can only be avoided by the enforcement of the promise. *See Pavel Enters., Inc. v. A.S. Johnson Co., Inc.,* 342 Md. 143, 674 A.2d 521, 532 (Md.1996) (adopting Restatement (Second) of Contracts § 90(1) (1979)).

■ In this case, McCormick never made a "clear and definite" promise to Dunnaville. Nordhoff's alleged statement that "they had a deal" could not qualify as such because so many important terms of the transaction were up in the air, including the purchase price and the extent to which McCormick was willing to finance the deal. Nordhoff

---

8. Dunnaville has not opposed the motion for summary judgment with respect to his claims against McCormick for breach of contract (Count V) and "breach of agreement to negotiate in good faith" (Count VI). (*See* Part. Opp'n.) Accordingly, the Court shall GRANT summary judgment with respect to these claims.

9. Both Dunnaville and the defendants have presented their cases under the assumption that Maryland substantive law controls.

may have expressed optimism, but it is clear that there was no deal as yet. Additionally, McCormick never at any time agreed to pay Dunnaville either his expenses or a fee for his assistance in patching up the Golden West/Burger King relationship.

Moreover, under the circumstances of this case, Dunnaville could not have reasonably relied upon any assurances from Nordhoff that they "had a deal." Dunnaville approached McCormick with a proposal for a complex commercial transaction, the purchase of Golden West for $6.7 million. Both Dunnaville and McCormick were sophisticated commercial dealers, and the two parties expressly contemplated drawing up a detailed, comprehensive agreement. No reasonable businessman would rely upon Nordhoff's statement when so many terms of the transaction were up in the air. At the time Dunnaville claims to have been relying on Nordhoff, he sent two proposed Agreements in Principle expressly providing that neither side would be bound (even if the Agreement were counter-signed by McCormick, which never occurred) unless and until a "definitive acquisition agreement" was executed. Certainly, Dunnaville did not consider himself bound to the sale, especially when, as was the case in January 1995, the future of Golden West's business with Burger King remained uncertain. Moreover, it is also clear that Nordhoff lacked the actual or apparent authority to bind McCormick orally to such a significant transaction. Any reasonable businessman would know that formal corporate action would be required. For example, Dunnaville knew that any final deal required the approval of McCormick's Board or Executive Committee. Accordingly, Dunnaville's claim for promissory estoppel is without merit.

### 2. Unjust Enrichment and Quantum Meruit (McCormick and Golden West)

 Similarly, Dunnaville's claims for unjust enrichment and quantum meruit must also fail. Unjust enrichment and quantum meruit, both "quasi-contract" causes of action, are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided. These remedies are not applicable here. Unjust enrichment, for example, requires that: (i) the plaintiff conferred a benefit upon the defendant; (ii) the defendant was aware of or appreciated the benefit; and (iii) the acceptance or retention by the defendant of the benefit under the circumstances makes it inequitable for the defendant to retain the benefit without payment for its value. *See Mass Transit Admin. v. Granite Constr. Co.,* 57 Md.App. 766, 471 A.2d 1121, 1125 (Md.Ct. Spec.App.1984).[10] A classic example might be the person who, without paying, follows and listens to a tour guide for hire providing a tour to another group, knowing that the tour guide charges for this service.

 It is clear, however, that "[w]here preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations thereto, quasi-contractual relief is unwarranted." *See North Am. Fin. Group, Ltd. v. S.M.R. Enters., Inc.,* 583 F.Supp. 691, 700 (N.D.Ill.1984) (quoting *Rutledge v. Housing Auth.,* 88 Ill.App.3d 1064, 44 Ill.Dec. 176, 411 N.E.2d 82, 86 (Ill.App.Ct.1980)); *see also Bloomgarden v. Coyer,* 479 F.2d 201, 211–212 (D.C.Cir.1973) ("Nor is compensation mandated where the services were rendered simply in order to gain a business advantage."). In other words, when a plaintiff benefits his opposite number during commercial negotiations, it is inappropriate to award quasi-contractual relief. The plaintiff obtained all of the compensation expected: namely, the

---

**10.** Both parties cite to the *Mass Transit Administration* case for the proposition that quantum meruit has four elements: (i) the plaintiff rendered valuable services; (ii) to the person or persons being charged; (iii) who accepted, used, and enjoyed them; and (iv) that the plaintiff rendered the services under such circumstances that reasonably notified the person to be charged that the plaintiff, in rendering the services, expected to be paid for them. The Court does not find an explicit statement of these elements in that case. In any event, these elements and the theory of quantum meruit are essentially indistinguishable for purposes of this case from the elements for unjust enrichment discussed above.

goodwill of his counterpart negotiator, the increase in value of the property he sought to obtain, or both.

■ Such is precisely the case here. By participating in the presentations to Burger King, Dunnaville sought to advance two goals: (i) to ensure that Burger King would continue to do business with Golden West, thereby preserving the primary value of the company Dunnaville sought to purchase; and (ii) to reassure McCormick that its contemplated financing of his purchase of Golden West was a wise investment, thereby allowing him to obtain Golden West. By attempting to preserve Golden West's Burger King account, Dunnaville therefore was not providing a "service" for which he would ordinarily obtain a fee; rather, he was promoting his own business interests.

Moreover, Dunnaville cannot point to any promise by McCormick that he would be compensated for his efforts. Also, Dunnaville made no request for compensation until March of 1995 when he—for the first time—asked for a transaction or break-up fee as part of a draft Agreement in Principle. McCormick never agreed to pay such a fee.

Dunnaville's efforts, however beneficial to McCormick and Golden West, did not, therefore, fall within the category of actions which merit the equitable remedies of unjust enrichment or quantum meruit. Accordingly, these claims cannot stand.

### 3. "Breach of Non–Disclosure and No–Shopping" (McCormick)

■ Dunnaville's claim for "breach of nondisclosure and no-shopping," cannot succeed either. Dunnaville's claim in this regard must depend, if at all, upon: (i) an agreement between him and McCormick to prohibit McCormick from seeking other buyers for Golden West while they negotiated; or (ii) a disclosure of Dunnaville's confidential information to such other buyer.

Dunnaville can satisfy neither of these tests. McCormick never agreed to Dunnaville's proposed Agreements in Principle, which would have restricted McCormick from soliciting other bids for Golden West. Moreover, Dunnaville presents no evidence (and the Court finds none on its review of the

record) that McCormick or its brokers disclosed Dunnaville's confidential information either to the ultimate purchaser of Golden West, Brooks, or to any other outside party. (*See* Loeb Dep. at 104–05; Brooks Dep. at 66.) Accordingly, Dunnaville's claim in this regard is without merit.

### B. Tortious Interference with Contractual Relations Claims against Chapman and Loeb

■ Finally, Dunnaville's claims against Chapman and Loeb for tortious interference with contractual relations are without merit. To state such a cause of action under Maryland law, a plaintiff must prove:

(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663, 675 (Md.1984) (quoting *Willner v. Silverman*, 109 Md. 341, 71 A. 962 (1909)) (internal quotation marks omitted).

■ As a necessary element of such a tort cause of action, however, the plaintiff must also demonstrate that the individuals engaging in the "interfering" activity were not operating at the request of one of the parties to the (contemplated) contractual relationship. So, for example,

[i]t is well established that in order to state a cause of action for tortious interference with a business relationship, a plaintiff must allege that a *third party*, without justification and for an unlawful purpose, intentionally interfered with the business relationship between the plaintiff and another, causing the plaintiff actual damage. Maryland courts have 'never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract.' Thus, when an employee acts within the scope of her employment, or as an agent of her employer, she cannot be held liable for interfering with the con-

tract, business relationships, or economic relationships, between the employer and another.

*Bleich v. Florence Crittenton Servs.*, 98 Md. App. 123, 632 A.2d 463, 474–75 (Md.App. 1993) (citations omitted). Moreover, a third party who provides advice at the request of one of the negotiating parties enjoys immunity from a "tortious interference" claim. *See Storch v. Ricker*, 57 Md.App. 683, 471 A.2d 1079, 1089 (Md.App.), *cert. denied*, 300 Md. 154, 476 A.2d 722 (Md.1984), *overruled on other grounds, Lake Shore Investors v. Rite Aid Corp.*, 67 Md.App. 743, 509 A.2d 727, 732 n. 4 (Md.Ct.Spec.App.1986).

In this case, it is undisputed that Loeb and the Chapman firm operated as McCormick's agents in soliciting bids and evaluating proposals for the sale of Golden West. There is no evidence to suggest that their advice to McCormick was dishonest or unfair. Even if their advice were tainted, Loeb and Chapman, who were representing McCormick, enjoy immunity form a tortious interference claim involving alleged contractual relations between McCormick and Dunnaville. Accordingly, Dunnaville's claims against Loeb and the Chapman firm must fail.

## IV. Conclusion

For the reasons stated above, this Court shall, by separate Order, GRANT the Motion for Summary Judgment with respect to all claims and ENTER JUDGMENT in favor of the defendants.