**BURTON IMAGING GROUP, Plaintiff,**

v.

**TOYS "R" US, INC. Defendant.**

**Civil Action No. 06–2420.**

United States District Court,
E.D. Pennsylvania.

Aug. 8, 2007.

Eleanor T. Barnett, Glen H. Waldman, Bilzin, Sumberg, Baena, Price & Axelrod LLP, Miami, FL, Jason A. Copley, Robert G. Ruggieri, Cohen Seglias Pallas Greenhall & Furman PC, Philadelphia, PA, for Plaintiff.

Jonathan M. Korn, Blank Rome Comisky & McCauley, Cherry Hill, NJ, Louis H. Kozloff, Blank Rome, LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Burton Imaging Group (Burton) brought this action against defendant Toys "R" Us, Inc. (TRU) for detrimental reli-

ance, quantum meruit, unjust enrichment, and fraud in the inducement arising out of alleged misrepresentations made by TRU employees. TRU has moved for summary judgment. Because Burton has failed to offer sufficient evidence to establish essential elements of its claims, the motion as to all claims is granted.

## FACTS[1]

Burton is a digital graphic production company located in Pennsylvania. TRU owns a graphic display, known as a "Scrim," which covers the facade of TRU's store in Times Square in New York City. The Scrim is a "one-of-a-kind" system of rolling panels of advertisements. Since 2001, TRU had a contract with a vendor, Vomela Specialty Company ("Vomela"), to run the Scrim project. TRU's contract with Vomela was set to expire in the fall of 2005, and Mike Tabakin, Director of Marketing at TRU, and Kathleen Szymanski, Vice President and General Manager of the Times Square store, determined that TRU should find a back up vendor just in case Vomela was unable to service its needs. Szymanski challenged Ron Javer and Andrea Rovaggi, employees of TRU and part of TRU's marketing department, to reduce production costs, either by finding a cheaper vendor for the Scrim or by convincing Vomela to reduce its price.

In February 2005, Javer of TRU contacted Mark Bilker at Burton about the Scrim opportunity. Interested in the concept of the Scrim, Scott Segen, co-owner and president of Burton, contacted Javer to discuss the project further. Soon thereafter, a meeting took place at the TRU Times Square store. Segen and Bilker met with Javer, and Javer told Burton that TRU was looking for a new vendor to potentially take over the Scrim project. Segen testified that Javer disclosed TRU's "unhappiness with [their current] supplier." Segen also testified that Javer told him that TRU disliked the present supplier's "inflexibility on price" and "their geographic distance between Minnesota where ... the supplier is located and Times Square[.]" Also, Segen testified that Javer told him that other companies would be bidding on the Scrim contract, but specifically identified only Vomela, the incumbent.

In March 2005, the next meeting took place, again at the Times Square store. The same people attended this meeting, with the addition of Rovaggi of TRU. Rovaggi provided technical details to Burton regarding the Scrim. In a subsequent meeting on April 4, 2005, Burton explained to TRU its pricing structure, operations, and how it would handle the project from production to installation. After this meeting, Burton understood that it would need to provide full size printed panels to show the materials and colors Burton would use if it produced the Scrim.

On May 2, 2005, Vomela and TRU met, and TRU informed Vomela that another company was bidding on the Scrim. TRU explained that it intended to lower its prices and improve its technology, and they needed assurance that Vomela would have an alternate site closer to Times Square in case there was a problem with the Scrim. In response, Vomela offered to reduce its price by three percent and subsequently addressed TRU's other concerns.

TRU then asked Burton to produce various samples for TRU so that TRU could determine whether Burton's product met

---

**1.** The facts are stated in the light most favorable to the plaintiff, the non-moving party, and its allegations are taken as true when supported by "proper proofs wherever those allegations conflict with those of [the defendant]." *See Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004).

TRU's standards. On May 23, 2005, Burton submitted a proposal that included a ten percent discount for any TRU promotion, and an offer by Burton to purchase a cycle of graphics space. The proposal would produce a savings of 6.3% over the course of a year. At the conclusion of a meeting on June 15, 2005, Tabakin informed Segen that TRU believed in long term relationships, TRU sought a long-term relationship with Burton and it would be important for Burton to fix the technological problems in the samples Burton had prepared, such as the color intensity.

Szymanski believed that TRU should compare proposals based on three criteria: product quality, service levels and price. She also believed that Vomela scored especially high in product and service levels, because TRU had a history with Vomela as the provider of the Scrim. These criteria were never communicated to Burton.

During the 2005 summer, representatives of TRU met with Burton to visually inspect Burton's product. TRU found that Burton's sample quality was "very good," and that Burton should proceed to the next step, which was the Revolution Power Test. Revolution Display System conducted the test at a cost of $3,000, to be paid by Burton. The Revolution Power Test would determine if Burton's product met TRU's standards for strength, durability and overall quality.

Most unfortunately, at a meeting on July 20, 2005, Szymanski told Segen "you got what we want, you can deliver it at the price you say you can deliver it at, we're going to move ahead with you as long as everything you're doing passes the Revolution Power test." Believing they had a deal if the Revolution Power Test went well, Burton started mastering and improving the Scrim system, dedicating hundreds of man hours to the TRU proposal.

On July 26, 2005, Rovaggi of TRU created a time line detailing how TRU expected to proceed in the bidding process. This time line was an internal document, and it included an entry for August 16, 2005, indicating that TRU "would share results with Vomela and allow them to rebid."

In the fall of 2005, Revolution sent TRU a glowing letter stating that Burton had passed the test and had met TRU's quality standards. The letter stated that the "test was a complete success" and further praised the Burton team. At a meeting after the Revolutionary Power Test, Wayne Schur, a representative of Burton, recalled Szymanski saying that she felt Burton had won.

After passing the Revolution Power Test, Burton undertook additional preparations for the anticipated change over in January 2006. Burton leased a new space in Philadelphia to accommodate new equipment, it contracted with an IT firm to start computer technology work for TRU, and it started hiring more employees to meet TRU's deadlines.

On September 21, 2005, the TRU team met to discuss the bids submitted. Present at this meeting were Szymanski, Tabakin, Javer and Rovaggi. Each member expressed his or her preference. Tabakin, Javer and Rovaggi preferred Burton because of substantial cost savings; but Szymanski preferred Vomela because TRU had a solid relationship with Vomela based on past experience.

By November 2005, Burton had completed its due diligence, and its price proposal was about thirty percent lower than Vomela's. Szymanski told Segen to expect a letter of intent from the TRU legal department. However, Burton never received a letter of intent from TRU. Segen followed up via e-mail to Szymanski to inquire about the status of the promised letter of intent, but Szymanski never responded. In late November, Szymanski contacted Cheryl Renette, a regional sales

manager at Vomela, and informed her that Vomela needed to lower its price by thirty percent and purchase a panel on the Scrim to win the contract. Not wanting to lose the Scrim contract, Vomela lowered its price and bought a panel on the Scrim. Vomela's price still exceeded Burton's, but the bids were comparable, and Vomela's new bid offered TRU savings of $600,000 per year over three years compared to the existing contract.

From the fall of 2005 until early December, TRU never informed Burton that it was considering any other vendors for the job. In early December 2005, Szymanski informed Burton that Vomela would be awarded the Scrim contract, and Burton was shocked.

On June 8, 2006, Burton filed this lawsuit asserting claims for fraud in the inducement, detrimental reliance, and quantum meruit. On January 31, 2007, Burton amended its complaint to include a claim for unjust enrichment. On March 15, 2007, TRU moved for summary judgment as to all claims.

## LEGAL STANDARD

This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because the parties are citizens of different states [2] and the amount in controversy exceeds $75,000.

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material facts to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to withstand summary judgment, the non-moving party must make a showing "sufficient to establish the existence of every element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When deciding a summary judgment motion, the Court must make all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

At oral argument, the parties agreed that Pennsylvania law applies to all claims.

### Detrimental Reliance/Promissory Estoppel

In Count II [3] of its amended complaint, Burton alleges that it detrimentally relied upon a promise made by TRU, which caused Burton to expend large amounts of time, money and effort. "Detrimental reliance is another name for promissory estoppel." *Travers v. Cameron County Sch. Dist.*, 117 Pa.Cmwlth. 606, 544 A.2d 547, 550 (1988). The elements of detrimental reliance are: "(1) a promise to

---

**2.** Burton is a Pennsylvania corporation with its principal place of business in Pennsylvania. TRU is a Delaware corporation with its principal place of business in New Jersey and conducts business in Pennsylvania.

**3.** Count I of its amended complaint alleges an action for fraud in the inducement. At oral argument, Burton admitted that one essential element for fraud in the inducement is that the parties entered into a contract, and that there is no evidence of a contract in this case. For this reason, summary judgment as to Count I will be granted.

a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce action, and (4) which should be enforced to prevent injustice to the promisee." *C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir.1988); *KSM Assoc., Inc. v. ACS State Healthcare, LLC*, No. 05–CV–4118, 2006 WL 1308267, at *2 (E.D.Pa. 2006). Burton fails to satisfy the first two elements of this claim.

The first essential element of promissory estoppel requires an express promise between the promisor and promisee. A "broad or vague implied promise" will not suffice. *C & K Petroleum Prods., Inc.*, 839 F.2d at 192 (implied promise by bank to "administer the main checking account ... in the normal, banking fashion" too vague for promissory estoppel claim). Even an express promise must indicate with "reasonable certainty" the intent of the parties. *Ankerstjerne v. Schlumberger Ltd.*, No. 03–CV–3607, 2004 WL 1068806, at *5 (E.D.Pa. May 12, 2004), *aff'd*, 155 Fed. Appx. 48 (3d Cir. Sept.1, 2005). In *Ankerstjerne*, the defendant, a technical consulting company known as Schlumberger, hired the plaintiff, Ankerstjerne, for a sales position and paid performance-based bonuses in 2001. The following year, Ankerstjerne performed his duties, but Schlumberger failed to award bonuses for two projects. A Schlumberger employee told Ankerstjerne that "it was ridiculous" that the plaintiff had not been compensated, and that he would "get it taken care of per the terms of [plaintiff's] compensation plan." *Id.* at *6. The court held that these promises could not support a claim for detrimental reliance because the promise was "too indefinite[,]" and did not "specif[y] when or how much the plaintiff would get paid" for each project. *Id.*

■ At oral argument, Burton predicated its right to recover for detrimental reliance upon the statement made by Szymanski at a meeting on July 20, 2005. Szymanski said, "[w]e're going to move ahead with you as long as everything that you're doing passes the Revolution Power Test[,]" and Burton passed the Revolution Power Test. This statement of "going to move ahead" is simply insufficient to qualify as a promise for a claim of detrimental reliance because it does not express the intent of the parties with reasonable certainty. Like the promise in *Ankerstjerne*, Szymanski's statement fails to indicate key terms such as payment to Burton or duration of the Scrim contract. Therefore, Szymanski's express promise to "move ahead" is too vague to satisfy the first element of detrimental reliance.

Burton also fails to meet the second essential element of detrimental reliance, that the promisor should have reasonably expected the promise to induce action by the promisee. Under Pennsylvania law, the promisor must have an objectively reasonable belief that a purported promise will induce action by the promisee. *C & K Petroleum Prods., Inc.*, 839 F.2d at 192. Action induced by the promisee's mistaken judgment will not satisfy this element of detrimental reliance because such reliance is not reasonable. *See Murphy v. Bradley*, 113 Pa.Cmwlth. 387, 537 A.2d 917, 919 (1988) (where plaintiff received raise in six prior years and relied on future raise when applying for a mortgage, and raise was not paid, plaintiff had no claim for detrimental reliance because he had relied solely on his own "mistaken judgment" that future raises were forthcoming).

■ Similarly, businesses may not rely merely on their own interpretation of the legal significance of a promise. In *Josephs v. Pizza Hut of Am., Inc.*, a case analogous to the instant matter, a trial court in this Circuit ruled that a plaintiff could not reasonably rely solely on its own judgment in determining the legal effect of a promise.

733 F.Supp. 222, 226 (W.D.Pa.1989), aff'd, 899 F.2d 1217 (3d Cir.1990). The plaintiffs in *Josephs* sought to purchase a building in Pittsburgh, and they required two tenants to secure financing. *Id.* at 223. Plaintiffs negotiated with a representative of Pizza Hut, who informed them that if they leased the building in Pizza Hut's name, corporate approval from Pizza Hut would be a "mere formality." *Id.* at 223, 226. After the plaintiffs signed the lease, Pizza Hut rejected it, and the plaintiffs brought a claim for promissory estoppel. The court held that "reasonable reliance must be based on the promises of the party to be bound ... and not simply on the judgment of the promisee." *Id.* at 227. The court ruled that the plaintiffs, experienced business owners represented by counsel, had not reasonably relied on the Pizza Hut representative's promise, as they had no assurance from counsel that the promise constituted "an existing, legal contractual obligation." *Id.* at 226. Instead, plaintiffs based their decision to purchase the building on a business hunch that Pizza Hut would execute the lease. *Id.* at 227.

In this case, Burton relied on Szymanski's statement at the July 20, 2005 meeting that, "we're going to move ahead with you as long as everything that you're doing passes the Revolution Power Test." Burton construed this to mean that passing the Revolution Power Test was both necessary and sufficient to finalize the deal, such that any further approval by TRU would be a "mere formality." *Id.* at 223. As in *Josephs*, Burton relied solely on its own judgment in determining the legal effect of Szymanski's promise. Burton's reliance, based on its own mistaken judgment, was unreasonable as a matter of law. *Murphy*, 537 A.2d at 919. Therefore, Burton has failed to demonstrate the existence of a genuine issue of material fact regarding elements one and two of its claim for detrimental reliance, and TRU is entitled to summary judgment on this claim.

## Quantum Meruit and Unjust Enrichment

■ In Counts III and IV of its amended complaint, Burton asserts claims for quantum meruit and unjust enrichment. A plaintiff must prove the same elements for quantum meruit and unjust enrichment. *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000). The elements for these claims are: "[ (1) ] benefits are conferred on one party by another, [ (2) ] appreciation of such benefits by the recipient, and [ (3) ] the acceptance and retention of these benefits under the circumstances such that it would be inequitable or unjust for the recipient to retain the benefits without payment of value." *Id.* at 447 (quoting 16 Summ. Pa. Jur.2d *Commercial Law*, § 2.2 (1994)); *Mill Run Assoc. v. Locke Prop. Co.*, 282 F.Supp.2d 278, 293 (E.D.Pa.2003). Quantum meruit creates an implied promise between parties in the absence of a contract in order to prevent unjust enrichment. 16 Summ. Pa. Jur.2d *Commercial Law* § 2:16 (2006). "[N]o one who benefits by the labor and materials of another should be unjustly enriched thereby, so the law implies a promise to pay a reasonable amount for labor and materials furnished ...." *Id.*, § 2:2. A "benefit" is "any form of advantage." *Id.* Burton's claims fail on the third element.

■ A benefit conferred is not unjustly retained if a party confers the benefit with the hope of obtaining a contract. The parties have not brought to the Court's attention any cases under Pennsylvania law addressing the question of whether benefits conferred during contract negotiations are inequitable if retained, but other districts applying comparable state law have addressed this issue, and they are persuasive. Under Maryland law, for example, a plaintiff may not recover under unjust enrichment or quan-

tum meruit the value of services he rendered in the hopes of obtaining a contract for himself.[4] In *Dunnaville v. McCormick & Co., Inc.*, 21 F.Supp.2d 527, 535 (D.Md.1998), an action for unjust enrichment and quantum meruit, the plaintiff was a prospective buyer of the defendant's subsidiary corporation, Golden West. The plaintiff alleged that defendant had assured him they "had a deal." *Id.* at 532. Plaintiff then successfully undertook to prevent Golden West's largest customer, Burger King, from "granting an exclusive buying arrangement to one of Golden West's competitors." *Id.* at 529. In the end, the defendant sold Golden West to another purchaser, and plaintiff sued for unjust enrichment and quantum meruit, contending that he had conferred a benefit on defendant by preserving the Burger King account. *Id.* at 533. The district court granted summary judgment for the defendant, holding that quantum meruit and unjust enrichment are not warranted where the plaintiff performs "preliminary services" to enhance his chance of obtaining a contract, without the expectation of reimbursement. *Id.* at 535. The court found that the plaintiff had worked to benefit defendant and Golden West out of his own interest in enhancing the assets of a company he was poised to purchase, and to generate goodwill with the defendant. *Id.* at 535–536. Accordingly, he received all the "compensation" expected. *Id.* at 536. *See also North Am. Fin. Group, Ltd. v. S.M.R. Enters., Inc.*, 583 F.Supp. 691, 700 (N.D.Ill.1984) (under Illinois law, no claim for quantum meruit for consulting services rendered by plaintiff to defendant during course of commercial negotiations); *Absher Constr. Corp. v. Colin*, 233 A.D.2d 279, 649 N.Y.S.2d 174 (N.Y.App. Div.1996) (detailed cost analysis for pro-

posed construction was "merely preparatory to performance, and therefore could not constitute the basis for restitution based upon unjust enrichment.").

Much like the plaintiff in *Dunnaville*, Burton seeks to recover the value of services rendered during the preparation of Burton's proposal. Pl.'s Opp'n, 21. Burton devoted hundreds of man hours to the TRU proposal, leased space in Philadelphia and contracted with an IT firm in anticipation of the Scrim contract. Burton claims that these expenditures benefitted TRU by enhancing TRU's bargaining power vis-a-vis Vomela, but Burton has failed to offer evidence sufficient to demonstrate that TRU's retention of such a benefit would be unjust. Burton incurred these expenditures in the hope of obtaining the Scrim contract; the expenditures were "merely preparatory to performance[.]" *Absher*, 649 N.Y.S.2d at 175.

■■ Furthermore, a plaintiff seeking to recover expenses incurred must have reasonably expected reimbursement for those expenses. In *Allegheny Gen. Hosp.*, 228 F.3d 429, an action for quantum meruit and unjust enrichment, the plaintiff hospitals treated patients for certain medical illness which they traced back to the defendants, who sold tobacco products to the public. *Id.* at 433. Plaintiffs insisted that the defendants pay for the patients' medical and hospital expenses on the theory that the defendants had been unjustly enriched. The plaintiffs asserted that the patients' illnesses resulted from the patients' use of the defendants' products, and that the free medical care the smokers received from the hospital extended their longevity and generated more sales for the defendants. *Id.* at 438. The Third Circuit held that the plaintiffs "did not have a

---

**4.** The elements of unjust enrichment under Maryland law are identical to the elements under Pennsylvania law. *Dunnaville v.* *McCormick & Co., Inc.,* 21 F.Supp.2d 527, 535 (D.Md.1998).

reasonable expectation of payment from the [defendants,]" because defendants had no legal obligation to pay for the patients' medical care, such that the hospitals had not relieved them of any expense or obligation by providing such care for free. *Id.* at 447.

In this case, Burton claims that it should recover the expenses that it incurred in submitting its bid. However, Burton has not submitted any evidence that it expected to be reimbursed, or that such an expectation would be reasonable. Like the tobacco companies in *Allegheny Gen. Hosp.*, TRU never said or did anything to indicate to Burton that TRU would reimburse Burton for the expenses it incurred in submitting its bid. Also like the tobacco companies who benefitted incidentally from the smokers' continuing longevity, TRU may have incidentally benefitted from Burton's efforts, but it had no existing legal obligation to pay for any bidder's costs in preparing its proposal.

■ Burton also claims an inequity by permitting TRU to retain the value of the benefit conferred on it, namely the difference between the expiring contract with Vomela and the new contract. Pl.'s Opp'n, 21. TRU contacted Burton about the possibility of Burton becoming TRU's vendor for the Scrim project, and TRU used Burton's superior pricing to pressure Vomela to lower its bid. But Burton entered the bidding process to advance its own economic interest. Burton developed an impressive proposal, including a price lower than Vomela had ever offered, to enhance its competitive position. Burton alleges that TRU used Burton to achieve some other financial gain, but that does not render the resulting financial gain—the cost savings from Vomela's lower bid—"inequitable." *See In re Stendardo*, 991 F.2d 1089, 1101 (3d Cir.1993) (in bankruptcy context, benefit to debtor not unjust where it also advanced creditor's interest). If this were not true, every losing bidder would find solace in an action for unjust enrichment. Def.'s Reply, 22.[5]

For the reasons stated above, Burton's claims for quantum meruit and unjust enrichment fail to satisfy the third element, and summary judgment is granted on counts III and IV.

## ORDER

**AND NOW,** on this *8th* day of August, 2007 defendant's motion for summary judgment (Doc. # 25) is **GRANTED** in its entirety.

---

**5.** Burton responds that the bidding process was a sham because Szymanski never intended to award the contract to anyone other than Vomela. Burton offers no authority for the proposition that parties negotiating over a potential contract have any implied duty to negotiate in good faith absent an express agreement to do so. Therefore, even if TRU never intended to award the contract to Burton, regardless of the merit of Burton's proposal, Burton is not entitled to recover either the costs of its expenditures in preparing its proposal or the value of the savings due to Vomela's price reduction. Regardless of TRU's motives for not awarding the Scrim contract to Burton, Burton chose to submit a proposal and assumed the risk that the probability of obtaining the contract was low or non-existent.